THE FIRST NATIONAL BANK OF GAINESVILLE *et al. v.* CODY *et al.,* administrators, *et al.*

1. A written instrument, executed and attested as a deed, and which, among other things, conveys title to real and personal property, the grantor reserving to himself in the instrument a power of sale, upon specified trusts and conditions, is entitled to be recorded as a deed; and when properly recorded, may be introduced in evidence without proof of its execution; but recitals of fact therein are not evidence of the truth of such recitals as against one who was not a party to the instrument.
2. It was error to admit in evidence an unsigned entry upon a deed, offered to show the time it was filed for record.
3. When, in answer to a proper question, illegal testimony was elicited, there was no error in ruling it out on motion of the opposite party. An admission by the plaintiff's intestate in his lifetime to the agent of the defendant, a corporation, was inadmissible evidence, the statute making the agent an incompetent witness to prove it.

4. Where, in a written contract for the formation of a partnership, it was stipulated that the partnership was to begin when certain stocks of goods were consolidated and inventoried, it was competent for the parties to waive this stipulation and begin business as partners before the time originally contemplated, and it was error to charge that no partnership could exist until the stocks of goods had been put together and an inventory thereof taken in full.

5. Where one inserts in a newspaper an advertisement of a partnership between himself and other persons, which does not in fact then exist, the latter are not affected by such advertisement in the absence of evidence showing they knew of and acquiesced in it.

6. After a partnership is dissolved by the death of one of its members, the acceptance by a creditor of a renewal note executed in the firm name by one of the survivors, and extending the time of payment fixed by the note renewed, discharges the individual liability of all the partners except the one who executes the renewal note, but does not discharge the partnership assets. These remain liable, in equity at least, for the payment of the debt.

7. If, after the dissolution of a partnership by the death of one of its members, a surviving partner in the name of the firm conveyed land which constituted a portion of the partnership assets, in part payment of a debt for which neither the firm nor its assets were liable, the creditor holding such debt took nothing by the deed except the individual interest in the land of the partner who executed the deed, and took that interest subject to the payment of the partnership debts, and subject also to any prior conveyance of the land by that partner of which the creditor had notice.

8. If, after the dissolution of a partnership composed of three members, by the death of one of them, one of the two survivors, with the consent of the other, assumed possession and control of the partnership assets for the purpose of applying the same to the partnership debts, he thereby became the liquidating surviving partner, and could, without any express assent of the cosurvivor, apply such assets to any *bona fide* debt to which they were subject, although such debt was not one intended to be provided for in the arrangement between the two survivors, and was in fact unknown to the cosurvivor when the arrangement was made. As to assets consisting of partnership realty used by the firm in its business, the liquidating partner had no power to convey the legal title, except in so far as his own interest was concerned, but he could convey the equitable title of all the partners in such realty to a creditor of the partnership in payment, or part payment, of a *bona fide* debt chargeable upon the partnership assets. If the debt in question was infected with usury, this fact alone would not invalidate the conveyance, the payment being applied only to the principal and the lawful interest, and the usurious contract having been made prior to the payment.

9. As to questions made in the grounds of the motion for a new trial not expressly covered by the foregoing rulings, the court committed no error requiring a new trial.
January 27, 1894.

Equitable petition. Before Judge WELLBORN. Hall superior court. January term, 1893.

On January 14th, 1891, the administrators of James M. W. Cody brought an equitable petition against John L. Palmour, H. H. Dean, the First National Bank of Gainesville, and Jeptha M. Cody. The last named filed an answer in the nature of a cross-bill, and made common cause with the plaintiffs. The suit was defended by the bank. Palmour did not appear or plead, and it appeared from the return of the sheriff that he was not served, and was living without the State. The object of the petition was to obtain a decree declaring that a note given to the bank by Palmour, and signed with the partnership name of Palmour, Cody & Company, was an individual liability of Palmour, and not of the partnership; and to cancel a deed executed by Palmour in the name of the partnership to the bank, conveying land which belonged to the partnership, in part payment of the note; it being alleged that the deed was void as title for the reason already stated, and for usury charged in the loan. The petition further sought to have certain notes and accounts due the late firm of Palmour, Cody & Company, and which had been turned over by Palmour to H. H. Dean, put into the hands of a receiver, and the proceeds applied to the payment of the debts of the partnership, etc. The jury found for the plaintiffs, that the note held by the bank was an individual note of Palmour, that the deed to the bank was void, and that the notes, accounts and money in the hands of Dean be applied to the legal debts of the firm of Palmour, Cody & Company. The bank and

v 93-9

Dean moved for a new trial; the motion was overruled, and they excepted.

It appears from the evidence that in the early part of 1889 (the exact day is in dispute), a partnership was formed between Palmour and the two Codys for the transaction of a mercantile business. A paper put in evidence by the plaintiffs, dated March 16th, 1889, recites that this agreement is to take effect when the stock of Palmour & Smith and Jep. M. Cody is put together and inventory in full taken, which shall be within the next 20 or 30 days. John L. Palmour agrees to furnish a stock of goods described, and the lot of realty in question, and the Codys agree to furnish a stock of goods and furniture then in Warrenton. It is further agreed that in this way a capital of $20,000 is put in, Palmour owning half and sharing half of all the profits and losses during a twelve months business, and the Codys owning the other half and sharing half the profits and losses for one year, or as long as the business is thus run: "contract in full to be drawn in next 30 days." J. M. W. Cody died October 12th, 1889. Palmour is now insolvent, and a non-resident. He was a director in the bank after Cody's death to the close of that year. The plaintiffs introduced a note for $2,250, dated May 22d, 1890, payable to them by John L. Palmour, and due December 1st, 1890; and a paper of the same date signed by Palmour, reciting that it was between him, one of the surviving partners of the firm named, of the one part, and the plaintiffs of the second part. It further recites that the party of the first part, as one of the surviving partners, at the general winding up and settling of the business of the firm between him and the parties of the second part, has this day turned over and delivered to them and Jep. M. Cody a lot of wagons and buggies of the estimated value of $800, which are a part of the remaining assets of the firm, and has delivered to the parties

of the second part his note for $2,250 already described; that in order to secure this note, he sells and conveys to the parties of the second part the lot of land in dispute, and also a number of notes and accounts, describing them. The real estate is to be sold, and the notes and accounts are to be collected by him, without expense to the estate of J. M. W. Cody, and the proceeds of the sale of the land and the amounts collected on the notes and accounts are to be held by him in trust for, and applied as fast as collected to, certain named debts due by the late firm, "which are all the debts said firm owes" (the claim of the bank not being herein mentioned). After the above described debts of the firm are paid by the party of the first part, the balance of the proceeds of the land and the amounts collected on the notes and accounts are to be held by him in trust for, and applied as fast as collected to, the payment of the note this day given by him to the parties of the second part, and the balance of the proceeds are to belong to him unincumbered by any lien or contract. It is not intended by this agreement that the parties of the second part surrender their equity in the assets of the late firm so as to make them subject to the individual responsibility of the party of the first part, but by this agreement he is authorized and agrees to sell the land and collect the notes and accounts as speedily as possible, and hold the proceeds in trust for the purposes above described. The payment of the note given by him to the parties of the second part is not to depend upon the success he has in collecting the notes and accounts due the late firm; but should said debts due [by] the late firm and the note to the parties of the second part be paid, then the balance of the collections or amounts due the firm, as above described, shall be held by the party of the first part free from any trust or incumbrance. This paper was attested like a deed. Indorsed on it at the top was, "11 A. M.

Dec. 31," without signature. Near the bottom: "Georgia, Hall county, clerk's office, superior court. Filed for record 11 A. M. Dec. 31, 1890. Recorded in book F, page 247, this 13 day of Jan., 1891. A. R. Smith, c. s. c." The plaintiffs also introduced the deed to the bank, dated January, 1891, reciting a consideration of $1,200, signed "Palmour, Cody & Co. by John L. Palmour," and properly attested. On the back was marked, "Filed for record January 9th, 5. P. M., 1891"; also: "Recorded in clerk's office, Hall county, in book W, folio 447, January 24th, 1891. A. R. Smith, c. s. c." Also, a note produced by the bank in response to notice, signed by Palmour, Cody & Co., payable to the order of the bank, dated May 14th, 1890, for $3,000 with interest at 8 per cent. per annum after maturity, and bearing the following credits: December 24th, 1890, $110; January 1st, 1891, $1,200 by deed to lot of land. Also, a deed from John L. Palmour to J. M. W. Cody and Jep. M. Cody, conveying to each of them an undivided fourth-interest in said land, dated September 20th, 1889, and recorded January 17th, 1893.

Norris (one of the administrators of J. M. W. Cody) testified: The only unpaid debts due by Palmour, Cody & Co., of which I have had notice, are two of those mentioned in the list set out in the agreement of May 22d, 1890, and a judgment in favor of Kiser & Co. Of the other two just mentioned, I am informed that one is not a just claim. I think the other is a legal debt. Mr. Cody had an individual note at the bank, which was paid by me as administrator, and I asked Castleberry, the vice-president of the bank, if there was any other indebtedness of J. M. W. Cody, and he said, no. The reason I asked was, that Mr. Cody had a note against me, and I did not know but it was there. This was in December, 1889. A claim of $1,500, stated in the agreement to be due by the late firm to the Gainesville Cotton Manufacturing Company, has been nonsuited.

Jep. M. Cody testified: I had nothing to do with making a note for the firm after my brother's death; did not know of such a note until Castleberry brought it to me. I went there one morning and asked him about what the firm owed. I knew there were some little accounts of two or three hundred dollars. He said, "Wait about half an hour, and I will bring them to you at the Hudson House." While I was there I saw Castleberry come by going towards Palmour's office. Did not see him go in the office. Palmour was then in another business. I was in the hotel waiting for Castleberry to bring me the amount the firm owed the bank. In a few minutes he brought that $3,000 note and two or three little ones. I asked him about the $3,000 note, and he said Palmour gave it for the firm. I replied, I knew nothing about it and did not think they owed it, but would examine the books. This was in May, 1890, and I never knew anything about it until that day. On the same day of the giving of the note by Palmour to the plaintiffs, he gave a like note to me, for what he owed me after paying up the indebtedness of the firm; and the same kind of contract was made between us as security for the debt, except that it did not conflict with the one made to the plaintiffs. Palmour agreed to sign it as soon as it was drawn up, but did not do so, though I presented it to him several times for signature. I held the note afterwards, and suppose it has been put in judgment by Mr. Davis, our attorney. I did not surrender my claim to the assets in any way. I sold out to Palmour, if taking that note sold out. We turned over to him everything except those buggies and wagons. All we got was that note. I took the note with the understanding that Palmour was to sign the note like the other paper. My understanding was that the firm was organized in May. I think the 2d of May was my first trip here. The firm was organized after that. After

that we took Palmour's stock, and I went down and brought mine, consisting of wagons and buggies. I was merchandising at Warrenton before, and that was what I considered the first connection I had with the firm. We got through taking stock about May 10th. I think my stock got here in June. The contract of March, 1889, in evidence, signed by Palmour and the two Codys, was signed by me temporarily. It was not a contract with me. It is the only one I signed. J. M. W. Cody came up here once or twice in March or April, 1889.

Swain testified: Was connected with the firm as book-keeper from July 28th, 1889, until they sold out for good and closed business. Was still in Palmour's employment when the contract of May 22d, 1890, was made. I was still bookkeeper, except some assistance I received from Palmour. He was working on the same books I kept. The ledger of the firm is in court. When bank notes are given entries ought always to be made, and when it was handed into the office it was always made, and anybody that keeps a correct set of books will do that; but I suppose it is sometimes overlooked. As far as I know it was not overlooked in my business. There was a $3,000 note on the ledger. I was not aware of the fact of this note. I know of no notes given to the bank before July 28th, 1889, unless they were entered up. After that I knew of no $3,000 borrowed from the bank. I did not know what the partners did; they could have borrowed all they were worth, and if they did not turn it into the office I did not know it. I do know they got a great deal of money from the bank, which advanced them from day to day. They borrowed a great deal of money for mercantile purposes. I did not know that fact, but I did know they borrowed money or drew checks on the bank for the purpose of buying cotton, and sent a bill of lading, and paid up each trans-

action every day.  I won't say every day, but days and days they did, until it would amount to thousands of dollars.  Palmour signed the checks, and I would sign same.  They ought to have been entered on the ledger, and were, so far as I know.  I was in the office, and if they were not entered I did not know it.  Most of the transactions commenced in the cotton season, and most of the money was borrowed after Mr. Cody's death. The cotton season starts about the first of October.  The firm was dealing with the bank all the time.  They dealt with no other bank, except to buy a few drafts.  I can't say they discounted notes due the firm during Cody's lifetime, but we did afterwards and got the money on them.  During Cody's lifetime this bank was the depository for the house.  I don't know that the firm discounted notes when they sold out their dry goods department, but think the books will show that.

Plaintiffs introduced a page from the ledger of the late firm, showing the following charges to account of bills payable in the year 1889 in favor of the bank, the entries being in the order stated: June 28, $1,425; Oct. 10, $1,000; Oct. 21, $653.53; Oct. 23, $621.06; April 26, $20; Jan'y 21, $2,000; Dec. 21, $500.  And the following credits to that account against the bank: June, $1,425; 9, $1,000; 20, $300; 28, $1,000, $1,000, $500. The journal of the late firm showed that it had been opened and the first entry made on May 7th, 1889.

Castleberry, vice-president of the bank, testified: I had no notice of the paper of May 22d, 1890, at the time the bank got the deed from Palmour.  He made that deed as a payment on the $3,000 note, and turned the books and accounts over to the bank as collateral on it.  He made that note April 27th, 1889, for the firm.  The bank credited the firm in making the loan.  The note in evidence is a renewal of that first note for $3,000.  Palmour transacted the business at the bank for the firm.  He

borrowed other sums for the firm. They transacted their cotton business at the bank. I suppose during the cotton season they would use as much as ten thousand dollars, sometimes more and sometimes less. We would furnish them all the money they wanted for what cotton they wanted to buy. All the money was credited to the firm of Palmour, Cody & Company. Palmour did some business for himself, and we have some notes against him now. We always kept the accounts entirely separate. I and the committee on loans, consisting of Green, Oslin and Dean, agreed to loan the first money. I don't know whether either of the Codys knew of this note when it was given, or that it was given. I think J. M. W. Cody was here at the time. He never said a word to me about the note, and I never spoke to Jep. Cody until the time he spoke of. Every renewal of the note was with Palmour. The reason that note ran during all this time when the other notes did not, was, that the national bank law does not allow us to carry past due paper, and it did not suit them to pay it, and we had to take a renewal. I did not mention it to either of the Codys, and they never heard of it, so far as I know, until after J. M. W. Cody's death. Our dealings were with Palmour. I don't know that Palmour got that money as an individual; he did not tell me so. He got the money as entered on the paper, and had no note to take up the paper with, except what is right here. I always renewed the note with him; he seemed to be attending to that business. We charged 12 per cent., and it was paid by the firm by Palmour. After the death of Cody, we renewed the note from time to time with Palmour. He did not pay any attention to this note until after Cody's death. We had several notes on Palmour, and could not collect them. He had a large interest in the Hudson House, covered by mortgage; and had some worthless factory stock. He

was a director of the bank at the time the note was first given, and is a first cousin to my wife. He traded his stock about the time the firm went out. We took no security for the note. We loaned it to Palmour, Cody & Company. We considered them good, and we did other merchants the same way. We did not loan it on Palmour's account. I think it was in March, J. M. W. Cody came into the business. He was here to do business in March, 1889. He told me he was worth fifty thousand dollars. That was before the note was given. I did not take the renewals privately. When Palmour would come into the bank I would call his attention to it. I never called on any of the others about the note or the cotton business. I always called on Palmour; he seemed to be running that part of it. The firm gave other notes besides this one, and they were all paid except this. Palmour was the member of the firm who signed notes and gave checks when he was here; sometimes he went to New York. Dean made the credits on the note. I think he put the one on for $110. Palmour paid it for the firm. It was paid at the time it bears date. I knew the land in question was Palmour's property, that he put it into the partnership, and that it belonged to the firm while the firm existed. I knew of Cody's death the day he was killed. Dean had this note for collection. My recollection is that the firm commenced business in March, 1889. They rented a store from us, Palmour & Castleberry, and occupied our store in April. Palmour made a loan of $1,425 of the bank for the firm on May 27th, 1889; another for $500, June 6th, 1889; another for $500, July 9th, 1889; and another for $700; as shown by the bank book. All these were made by him, except, perhaps, one by J. M. W. Cody. The book also shows other loans for $400, $300 and $500, made to the firm on August 10th and 21st, and November 27th, 1889. The firm used the lot

in dispute as a cotton yard. They used other money of the bank in addition to these notes. The loans and notes were public. I suppose the directors knew all about it. I never went to either of the Codys in connection with this business. Palmour attended to it all. The last note was given us in November, 1889; I think Palmour borrowed that money. He made arrangements for all of them. I don't know whether he borrowed money after this, or overchecked for it; he mostly overchecked for cotton; gave a note a time or two for cotton.

Defendants introduced three letters from J. M. W. Cody to Palmour, dated at Warrenton, March 19th, 21st and 23d, 1889. The first states: "I will send you on Thursday draft for part of the purchase money for my brother and myself in your business. . . I enclose basis of contract signed by Jep., and keep copy myself. We will send the goods, and will be up within the limit, Providence permitting, of the agreement," etc. The second says: "Your letter with the enclosures as stated, duly received. I am pleased to know that you are succeeding so well in the disposition of your goods, and trust that we will have no trouble in converting the present stock into such business as we purpose at an early date. I will come up next week and be prepared, if agreeable, to make the northern or eastern trip for you. Jep. will leave here on Monday the 8th of April, as he says that will be as early as he can get off. I have heard not a word from my cotton, but inclose herewith check on Ga. R. R. & Banking Co., for two thousand ($2,000.00) dollars for the present. . . I would not send this, but you seemed to need the money right away." The third says: "I am in receipt of yours of the 21st inst., and am proud to know that the fire there was no more serious than it proved to be. I fear, if the damaged stock of Mr. Logan is thrown on the

market, it will somewhat affect our prospects of so rapidly getting rid of our goods, but we will have the advantage in that ours are not damaged. I am making every effort endeavoring to be able to leave here on next Monday. I fear I shall leave some business unattended to at least. Will write you again on to-morrow." Also, copies of a newspaper published at Gainesville, of March 21st, April 18th, April 25th, May 9th, and November 7th, 1889, showing an advertisement dated March 19th, 1889, signed by Palmour, Cody & Co., successors to Palmour & Smith. Also, the original books of the bank, showing that the original loan of $3,000 was made to Palmour, Cody & Co., and entered on the books April 27th, 1889, and was renewed in each succeeding month, the last renewal being May 14th, 1890. Each renewal was for $3,000, the interest, $30 per month, being paid at each renewal. The books further showed the loans made to the firm and paid, as testified to by Castleberry.

Defendants also introduced the filing docket of the clerk's office, showing that the deed to the bank was entered thereon January 9th, 1891, and just above it in small writing was the filing of the contract of May 22d, 1890, between Palmour and the plaintiffs, with the date of filing stated as December 31st, 1890. There was conflicting evidence as to whether this contract was actually filed with the clerk before the date of the filing of the deed, it appearing on the one hand that the contract was carried to the clerk by one of the plaintiffs' attorneys on December 31st, 1890, and the clerk made a memorandum at the top, " 11 A. M., Dec. 31st "; whereupon the attorney carried the contract away for the purpose of copying it, and it was not returned to the office for some days, possibly not until the 12th or 13th of January, 1891. On the other hand, the testimony of the attorney tends to show that the contract was filed on the 31st of December, and left with the clerk for the

purpose of being filed at that time. It appeared that the entry on the filing docket, in the small writing above referred to, was made after the entry of the filing of the deed.

The motion for new trial has the following grounds:

1. Movants objected to the introduction in evidence of the contract of May 22d, 1890, on the grounds that its execution was not proved; that it was not such a paper as was admissible to record; and that it could not bind movants, they not being parties to it, and it not appearing that they had any notice of it, and it appearing that Palmour had never been served and had not appeared or pleaded. They further objected to this contract being admitted as evidence of the truth of the recitals in it, as against movants. The objections were overruled.

2, 3. Stated fully in the opinion.

4. After reading to the jury the agreement of March 16th, 1889, the court charged: "This paper is an agreement to enter into a partnership at the time mentioned in this paper; and I charge you that time was not of the essence of the contract, and that until the terms of this agreement were complied with, until the stocks of Palmour & Smith and of Jep. M. Cody were put together and inventory taken in full, no partnership could exist, and John Palmour could have no right or power to bind the firm by any note or contract he might make; and if you believe from the evidence that John L. Palmour borrowed the money from the bank before the partnership was complete according to the terms of their contract, and before the stock of the parties had been put together and inventoried, then I charge you that it would be Palmour's individual debt, and could in no way bind the other members of the firm, unless you find from the evidence that the firm got the money, or other members of the firm had knowledge of the transaction and ratified it."

5. The court charged: " In order to hold a person as partner on the ground of a holding out to the world or to a third party as such, it must appear that the holding out was by the party sought to be charged, or by his authority, or that he had notice of being so held out, or that there are circumstances from which notice can be presumed. This, where it is not the direct act of the party, may be inferred from circumstances, such as from advertisements. But it must appear that such advertisements were inserted by the party sought to be charged, or by his authority, or that he had knowledge of the insertion by other parties, and had an opportunity to repudiate it. I charge you, that if John Palmour inserted in the newspapers the advertisements of the firm of Palmour, Cody & Co., as already existing, when in reality it was not existing, he committed a fraud upon the other members of the firm, and unless they authorized such advertisements they would not be bound by it."

6–8. Errors in charging: " If you believe that after the death of one of the members of the firm a surviving member of the firm renewed the note of the firm, extending time for the payment thereof, then I charge you that even though it might originally have been a firm obligation binding on the partnership, such renewal not only released the other surviving member and the estate of the deceased member, but also released the assets of such partnership and made such debt the individual debt of the member renewing the same. And I charge you that after such renewal the surviving partner would have no right to apply the assets of such partnership or any part of them to the payment of said note, and such a payment would be a misapplication of the assets of said firm. If one of the parties after the dissolution of the partnership renew a note of the copartnership and extend the time of payment, this would relieve the individual members of the copartnership,

except the one renewing the note, from all liability on the note ; and where the holder of the note had notice of the dissolution of the copartnership before he accepted the renewal, the renewal would relieve the partnership from all charges for the payment of the note, and the note would be extended only as to the parties who renewed it. If you believe from the evidence that after the death of one of the members of the firm, the surviving partner renewed the note held by the bank, and extended the time of payment, this would make it the individual debt of the parties renewing it, and he could not afterwards pay the note or any part of it out of the assets of the firm, even though you believe the debt was originally the firm obligation. The renewal of said note not only released the estate of the deceased and the other surviving partners, but also relieved the assets of the firm in the hands of the surviving partner who renewed said note, and made it good only against the surviving partner as an individual. And if you believe he did so renew the note, it will be your duty to find for the plaintiff, that the deed made by John L. Palmour to the bank be cancelled and be null and void, and that said note is only the individual debt of John L. Palmour, and that the money, notes and accounts in the hands of H. H. Dean be applied to the payment of the legal debts of Palmour, Cody & Co., and that the land be sold and the proceeds also so applied. . . If you find from the evidence that there was usury charged in said loan by the bank, then, while John L. Palmour could make a deed to his interest in the land in payment of the debt, even though affected with usury, he could not make a deed to pay a usurious debt so as to affect the interests of the other members of the firm, and the deed would be void as to them."

The court charged that the contract between Palmour and the plaintiffs had the effect to fix a trust on the as-

sets of the firm to be appropriated as specified therein. This was error. The court should have qualified the instruction so as to exclude from its operation creditors of the firm who took without notice of the contract. One of the main contentions of the bank was, that the sale to Palmour by the plaintiffs and by Jep. M. Cody of all their interests in the firm assets, gave him the right to apply the same to the bank's note if it was originally a firm note, and that such sale would give him the right to apply the assets even to his individual debt, in the absence of notice to the purchaser of the reservation of any lien or equities. But the court ignored these alternative propositions, and did not charge the theory of the bank on this subject.

Error is assigned in the refusal of the court to give the following charge as requested : "It is contended by the First National Bank that the representatives of J. M. W. Cody, and also Jep. M. Cody, had sold out their entire interest to said John L. Palmour, and that therefore Palmour could make such disposition as he pleased. I charge you that should you believe from the evidence, and under the explanation I have given you, the representatives of J. M. W. Cody and Jep. M. Cody did sell all their interests to said John L. Palmour, he could sell them in payment of even his individual debts, provided the purchaser had no notice of any trust or equity retained by the selling partners."

Dean & Hobbs, M. L. Smith and H. H. Perry, for plaintiffs in error. J. B. Estes and E. P. Davis, *contra*.

Lumpkin, Justice.

1. The material facts of this case are set forth by the reporter. The instrument, dated May 22d, 1890, and referred to in the first head-note, deals with title to land, and in this respect may be regarded as a deed, and having been executed and attested as a deed, we have no

difficulty in holding that it was entitled to be recorded in the clerk's office in the record of deeds. This having been done, there was no error in admitting it in evidence without proof of its execution. This instrument, however, being a contract between John L. Palmour and the administrators of J. M. W. Cody, in relation to various matters connected with the winding up and settlement of the affairs of the firm of Palmour, Cody & Co., of which Cody was a member, it is obvious that recitals of fact in this instrument could not be evidence of the truth of statements therein contained as against one claiming to be a creditor of the late firm. A conversation between the parties to this paper would be, as to any third person, simply hearsay, and the fact that their declarations have been reduced to writing does not in the slightest degree change the rule making such declarations inadmissible in evidence against other persons. The recitals in a deed made in pursuance of an order of court, or by virtue of legal process, are sometimes, for certain purposes, evidence of their truth, but parties cannot, in a voluntary contract between themselves, make their " recitals " evidence against anybody else as to prior existing rights. See in this connection *Mining Co.* v. *Irby*, 40 *Ga.* 479, 481, and authorities cited.

2. There was serious controversy between the parties to this case as to when the instrument in question was filed for record in the clerk's office, the plaintiffs contending that this was done at 11 o'clock A. M. on the 31st day of December, 1890, and the defendants insisting that it was not filed until afterwards. Indorsed on the instrument, at the top, there was an unsigned entry as follows: " 11 A. M. Dec. 31." This entry was offered to show the time of filing. Defendants objected, and at the same time offered to show by evidence that the entry was made by one who assisted the clerk, and not by the clerk himself, and also, that it was not made

upon the paper on the date indicated by the entry itself. The court refused to hear this evidence, but ruled that it might be introduced before the jury, and that they could pass upon the meaning and effect of the entry. Paragraph 15 of section 267 of the code requires clerks of the superior court "to make a minute on all conveyances or liens of the day left for record, and the day recorded, to be signed officially, which shall be evidence thereof." Taking into consideration the objection made to the introduction of this entry, in connection with the proof offered in support of the objection, we think the court erred in admitting the entry. Fairly construed, it at least amounted to an objection that the entry was not signed by the clerk, and this, under the section of the code cited, was sufficient to exclude it.

3. When Castleberry, an officer of the bank, was on the stand as a witness, he was asked whether J. M. W. Cody did not give the notes to the bank up to the time he went to Warrenton, and answered that Cody gave one note when Palmour was absent in New York. The witness was then asked by plaintiffs' counsel, "Don't you know it was made J. M. W. Cody's business to do that sort of business for the firm?" and replied, "Mr. J. M. W. Cody told me that John [meaning Palmour] attended to that." This answer was properly ruled out on motion of plaintiffs' counsel. It cannot be fairly said they brought it out; and under the evidence act of 1889, it was clearly inadmissible. Cody being dead, Castleberry, an officer of the bank, was an incompetent witness to prove the admission.

4. As originally contemplated in the contract for a partnership between Palmour and the two Codys, the partnership business was not to begin until two certain stocks of goods had been consolidated and an inventory of the same taken. The court charged, in effect, that no partnership could exist between these parties until

v 93-10

this had been done. There being evidence to sustain the contention of the defendants that, in point of fact, the partnership did commence in advance of the time stipulated in the contract, this charge was erroneous. It was undoubtedly competent for these parties to begin the transaction of a partnership business before the time at which they intended it should begin when the written contract was made.

5. The defendants sought to show that the partnership business actually began before the first note of $3,000, signed by Palmour, Cody & Co., was delivered to the bank, and for this purpose offered several copies of an advertisement, purporting to have been inserted by the firm, which had appeared in the Gainesville Eagle, a newspaper published in the city in which the partnership business was located. The dates of some of the insertions were prior to that of the note in question. There was no evidence that they were inserted by the Codys, or with their knowledge, or that they acquiesced in the same. In the absence of such evidence, the mere fact that an advertisement appeared in a public newspaper at a particular time could not affect the Codys, and would be insufficient to estop them from denying or proving that at that time no partnership had been entered into. It would be a dangerous doctrine to hold that a person could be held liable upon alleged partnership contracts by simply proving, without more, he had been advertised as a partner. Such a rule would operate rather harshly upon one who had never seen or heard of the advertisement, and consequently had had no opportunity to repudiate it in case it did not speak the truth.

6. It was contended by the plaintiffs that before the partnership consisting of John L. Palmour, their intestate, and Jep. M. Cody, began business as a firm, John L. Palmour had given to the bank a note for $3,000,

and that in point of fact this note was not for a debt of the partnership but for one due by Palmour individually. On the other hand, it was insisted by the defendants that this note was given after the partnership began business, and that it was for a debt of the firm. Whatever may be the truth upon this issue, it is quite certain that this note was several times renewed in the name of the firm, and the time of payment extended. The note in controversy in the present case was one of these renewals, executed by John L. Palmour in the firm name, and delivered to the bank after the dissolution of the partnership by the death of J. M. W. Cody. We shall not, of course, undertake to settle the disputed question as to whether or not this note was based upon a debt originally due by the firm or by Palmour individually. It will be necessary for the jury, upon the next trial of this case, to determine this issue. It is now incumbent upon this court to decide how this note should be treated and what effect should be given to it in case the jury should find it was in renewal of a firm debt.

The general rule that upon the dissolution of a partnership its assets are chargeable with the payment of the partnership indebtedness, and that a survivor may dispose of them for this purpose, is well settled. It is also true that after dissolution the partners are absolved from all liability upon future contracts; that one partner has no power to bind the firm by a new contract, and that a new promise made by one of them revives or extends the partnership debt only as to himself and not as to his copartners. Code, §§1896, 1917, 2937. It will be observed, however, that under section 1896, the dissolution of a partnership does not absolve the partners from liability upon past transactions, and therefore, in the usual course, partnership assets may be administered in settling partnership indebtedness, and for this reason section 1907 of the code gives the surviving part-

ner the control of the partnership assets to the exclusion of the legal representatives of a deceased partner. In the present case, however, it was contended that inasmuch as the renewal note was executed by Palmour after the death of J. M. W. Cody, which fact was known to the bank, that although the firm name was signed to the note, the effect of this transaction was to discharge Jep. M. Cody and the estate of J. M. W. Cody from all liability upon this indebtedness, and also to discharge the partnership assets. There can be no doubt that Jep. M. Cody and the estate of J. M. W. Cody were discharged. In Bernard *v.* Torrance, 5 G. & J. (Md.) 383, it was held that a retiring partner was discharged from the debts of the partnership by the acceptance by a creditor of new notes of the other partners as renewals of notes first given by the firm, provided the creditor agreed to discharge him by the acceptance of such new notes. See, also, Folk *et al. v.* Wilson, 21 Md. 538; Leabo *v.* Goode *et al.*, 67 Mo. 126; Davis *v.* Desauque, 5 Whart. (Pa.) 529; Mason *v.* Wickersham, 4 W. & S. (Pa.) 100. The doctrine of the above cases is, that a note given by one partner, after dissolution, for the debt of a firm, is an extinguishment of the original debt, so as to discharge the other partners, if such was the agreement when the note was given. It has been definitely decided by this court that where one holding a debt against a partnership accepts, after its dissolution, a renewal note or draft of one of the partners for the debt, and extends the time of payment without the knowledge or consent of the other partners, they are absolutely discharged. *Stone* v. *Chamberlin & Bancroft,* 20 *Ga.* 259; *Chamberlin & Bancroft* v. *Stone,* 24 *Ga.* 310; *Louderback, Gilbert & Co.* v. *Lilly & Wood,* 75 *Ga.* 855. In 2 Bates, Part. §694, it is stated that a partner, after dissolution, has no power to sign the firm name to negotiable paper, either by giving a note for an old debt, or for a loan, nor in renewal of prior similar papers.

We cannot, however, assent to the proposition that where a firm is dissolved by death, and a note due by the firm is renewed in the firm name by a surviving partner, the firm assets are not still bound for the debt. Nor are we aware of any case in which this court has held to the contrary. Accepting a note in the name of the firm, whether the surviving partner had the right to sign the firm name or not, at least manifests some intention on the part of the creditor not to release the partnership assets, or to look alone for payment to the member of the firm who signed the note. The manner of the execution of the note certainly indicates that the parties contemplated that the debt should still exist against the property of the late firm, and upon principle we see no reason why this is not both equitable and just. In Espy v. Comer, 76 Ala. 501, it was held that although when a partnership is dissolved by the death of one of the members, the surviving partners cannot, by any act of acknowledgment, revive or continue in force a debt of the firm so as to bind the estate of the deceased, the discharge of his estate does not change the character of the debt as a partnership liability. In Durant v. Pierson, 12 Law. Rep. An. 146, the New York Court of Appeals went so far as to hold that money loaned to a surviving partner for the express purpose of paying the debts of the firm, and so used, created a valid claim in equity against the assets of the firm. The note given for the loan was executed in the name of the firm and that of the surviving partner, and at the time this note was given, it was known to all the parties concerned that the senior member of the firm had died. Haight, J., said, in effect, that while the note was, in law, unavailable as an obligation of the firm, because the survivor had no power to make it, it did not follow that it was not a claim which ought, in justice and equity, to be paid out of the firm assets, citing Denton v. Merrill, 43

Hun, 224–229. In Case v. Beauregard, 99 U. S. 119, Mr. Justice Strong, in commenting upon the rights of partners with reference to partnership assets, says: "The right of each partner extends only to the share of what may remain after payment of the debts of the firm and the settlement of its accounts. Accordingly, out of this right, or rather included in it, is the right to have the partnership · property applied to the payment of the partnership debts. . . This is an equity that partners have as between themselves, and in certain circumstances, it inures to the benefit of the creditors of the firm." In Van Staden v. Kline, 64 Iowa, 180, it appeared that a firm had borrowed money, securing it by a mortgage upon realty belonging to the firm, and that after a dissolution of the firm by death, a surviving partner, together with his wife, in order to secure an extension of the loan, executed new notes and a mortgage to secure the same; and it was held that no new debt was thus created, but that the partnership property still continued liable for the original debt.

We have no doubt that numerous other authorities, supporting our ruling upon the question under consideration, could be found, but we deem it unnecessary to extend our search or to make further citations. The rule that partnership assets are primarily liable for partnership debts, and that such debts have a first preference upon such assets, is recognized in sections 1918, 3154, of the code. The operation of this rule should not be defeated simply because one member of the late firm has made an unauthorized change in the mere form of the indebtedness. It is going quite far enough to hold that, by making this change, the other partners are discharged from their individual liability. As to the firm, the debt still exists, and its assets are liable, in equity at least, for the payment of the debt.

7. As already stated, the plaintiffs contended that the

note for $3,000 involved in this case was not, in fact, a renewal of a partnership indebtedness, and the determination of this issue will devolve upon the jury at the next trial. Under the charge of the court, they were not called upon to decide this question at the last hearing. In the event they should determine that this note was in renewal of a debt for which the firm was never liable, but that it was from the beginning merely an individual debt of John L. Palmour, it would follow, of course, that the assets of the firm could not be subjected to its payment. If the truth, when ascertained, should be that it was really the individual debt of Palmour, he had no right, as surviving partner, to convey, in the name of the firm or otherwise, land constituting a portion of the partnership assets, in part payment of this debt. He could not convey to his creditor, in payment or part payment of his individual indebtedness, the property of the firm; and if he made a deed for this purpose, it passed nothing to his creditor (the bank) except his individual interest in the land. *Printup Bros. & Co.* v. *Turner,* 65 *Ga.* 71. And the bank took that interest subject, not only to the prior claim of partnership debts upon the land, but subject also to any previous conveyance of the land by Palmour of which the bank had notice. It appears that on the 20th of September, 1889, Palmour, by deed, conveyed to J. M. W. Cody and Jep. M. Cody each an undivided one fourth interest in the land in dispute; but this deed was not recorded until the 17th day of January, 1893, after the date of Palmour's deed to the bank, and there is no evidence to show that the bank had any notice of this conveyance to the Codys. It was a matter of dispute whether the bank, at the time it took the deed from Palmour, had notice of the contract dated May 22d, 1890, between him and the administrators of J. M. W. Cody. In the next division of this opinion, it will be shown that nothing contained

in this contract could, under the facts of this case, interfere with the power of John L. Palmour to wind up the affairs of the partnership, and, for this purpose, deal with the land in question.

. 8. While a firm exists, every partner, under section 1904 of the code, unless otherwise agreed, has the right to collect and apply its assets, and to contract or otherwise bind the firm in matters connected with its business; and under section 1896, already cited, a dissolution does not put an end to the powers and rights resulting from the partnership to the partners, so far as the exercise of those powers and rights may be necessary for winding up the business. In Parsons on Partnership (4th ed.), §294, this is stated to be the general rule. Where a partnership is composed of three members, and one of them dies leaving two survivors, the right to wind up the affairs of the firm devolves upon both; and whatever may be the rights and powers of a single survivor, where there are two, we think there can be no doubt that, by an arrangement or agreement between the two, one may become the liquidating surviving partner, and as such assume possession and control of the partnership assets for the purpose of applying the same to the partnership debts. Nor would it be necessary for such agreement between the surviving partners to be reduced to writing, as an arrangement of this kind would be equally valid and binding if resting alone in parol. Parsons, Part. §293.

The evidence in the present case shows that an agreement was entered into between Jep. M. Cody and Palmour, by which the latter was vested with power to wind up the affairs of the firm of Palmour, Cody & Co. The assent of the administrators of the deceased partner to this arrangement was not necessary. These administrators, it is true, by accepting from Palmour the contract of May 22d, 1890, did consent that the business of

winding up the affairs of the partnership might be conducted by Palmour, and that he might sell the partnership assets in paying off certain specified debts of the firm, which were declared in the instrument to be all the debts the firm owed, among which the note held by the bank was not included, and they had no knowledge of it at the time the contract was made. It is also most probably true that Jep. M. Cody knew nothing of the existence of this note at the time he gave his consent for Palmour to become the liquidating partner. It was insisted for the plaintiffs, that inasmuch as they were ignorant of the existence of this claim held by the bank when they accepted the contract referred to from Palmour, he had no right to dispose of the partnership assets in payment of that claim ; and the same position, if well taken, would be equally applicable to the arrangement between Palmour and Jep. M. Cody. As to these matters, we think, first, that if the note held by the bank was chargeable upon the assets of the partnership, the fact that the written contract between Palmour and the administrators of the deceased partner did not mention this debt would not deprive Palmour, as a surviving partner, of the authority to sell the partnership assets in settling it. The parties to this contract could not, by any arrangement between themselves, divert the assets from a proper administration; or limit the powers of the liquidating partner, who had become such by the consent of the other survivor, to make a lawful disposition of the same. And, secondly, we do not think the ignorance of that survivor of the existence of this debt would prevent Palmour from selling partnership property to pay it, in whole or in part. We are, therefore, satisfied that under the evidence Palmour had the same right to wind up the partnership business as if he had been the sole surviving partner, and as such he could, without the express assent of his cosurvivor, apply the

firm assets to any *bona fide* debt to which they were subject, and the fact that a particular debt of this kind was not intended to be provided for in the arrangement between Palmour and Jep. M. Cody, or that its existence was unknown to Cody, would be immaterial. Now, what were Palmour's powers in the premises?

Upon the dissolution of a partnership by the death of a member, the survivor becomes the sole owner of all the personal property of the partnership : 17 Am. & Eng. Enc. of Law, p. 1154; and has full power of disposition over the partnership property for the purpose of transforming it into distributable shape in order to wind up the business. *Ibid.* p. 1167. For the one purpose of winding up the concern, the surviving partner has as much power over its assets as he did when it was a going concern ; and his right to dispose of the personal property seems beyond question. While, under our system, land belonging to a partnership is held by the partners as tenants in common, it is also true that the land itself is assets liable in equity to the payment of the partnership debts. One partner could convey the legal title only so far as his own interest is concerned, but we think he could convey the equitable title of the other partners to a creditor of the firm in payment, or part payment, of a *bona fide* debt chargeable upon the partnership assets. In a court of equity, real estate belonging to the firm and treated as partnership property, is considered as personal property to the extent, at least, of being liable to pay the debts of the firm. The surviving partner being charged with the payment of the partnership debts, has the right, in equity, to dispose of its real estate for that purpose; and though his deed will not convey the legal title to a purchaser, it will convey this equity to him, and through it he may compel the heir to convey the legal title. Andrews' Heirs and Adm'rs *v.* Brown's Adm'r *et al.*, 21 Ala. 437.

To the same effect, see Espy *v.* Comer, *supra;* 2 Lindley on Partnership, *340. The doctrine is thus stated in a note to section 274 of Parsons on Partnership: "Since the surviving partner has the right of disposing of the assets to pay the debts and settle the accounts of the firm, he alone may make a valid conveyance of the partnership land. Although he cannot convey the legal title, he disposes of the entire equitable interest; and the purchaser may have a conveyance from the heir of the deceased partner by filing a bill in equity. The state of the legal title to the land is immaterial. The power of the survivor is just as great if the entire legal title was in the deceased, in trust for the firm." The following authorities are cited by the author in support of what is above quoted: Shanks *v.* Klein, 104 U. S. 18; Allen *v.* Withrow, 110 U. S. 119; Espy *v.* Comer, 80 Ala. 333; Davis *v.* Smith, 82 Ala. 198; Breen *v.* Richardson, 6 Col. 605; Van Staden *v.* Kline, *supra;* Riley *v.* Carter (Md.), 25 Atl. Rep. 667; Hanson *v.* Metcalf, 46 Minn. 25; Matthews *v.* Hunter, 67 Mo. 293; Easton *v.* Courtwright, 84 Mo. 27.

If, therefore, the claim of the bank was chargeable upon the partnership assets, Palmour's deed to the bank, if made in good faith and upon a fair consideration, conveyed the equitable title in the land to the bank; and this would be true even if the bank had notice, when it took the deed, of the contract of May 22d, 1890, between Palmour and the administrators of J. M. W. Cody, there being nothing, as already stated, in that contract which would, under the circumstances just indicated, affect the right of the bank.

This case, as to the question in hand, is distinguishable, we think, from that of *Baker* v. *Middlebrooks*, 81 *Ga.* 491. There, the firm of J. D. Head & Co., of which Baker was a member, was actually dissolved eighteen months or more before the death of Head; and it also

appeared that, though the land in dispute had been conveyed to the firm while it existed, this land had never been used in the partnership business. Strictly speaking, under the facts stated, Baker, so far as this land is to be regarded as assets of the firm of which he had been a member, was not the surviving partner of that firm, but was really the surviving former partner of it. Upon the dissolution of the firm, Head owned his interest in the land as a tenant in common with Baker, and upon the death of Head his undivided share vested in his heirs at law; and although this share was doubtless subject to satisfy the partnership creditors in preference to the individual creditors of Head, Baker had no right, as surviving partner, to recover it for his own use; nor would he, had he been in possession, have had the right to administer the land, either as legal assets of the firm or as the property of his deceased cotenant, and in so doing make to another an absolute and valid conveyance of the legal title. It does not really appear that Baker was seeking to recover the land for the purpose of administering it in payment or satisfaction of the partnership debts. It appears, on the contrary, that he had himself, out of his individual means, paid off the debts of the firm, and that his only purpose in endeavoring to recover the land was to reimburse himself for what he had expended in the firm's behalf. He doubtless intended to thus subrogate himself to the rights, as he understood them, of the creditors whose claims he had paid. In the light of the facts, the expressions used by Chief Justice Bleckley must be interpreted as meaning that Baker had no right to recover the land for the purpose of acquiring in himself a perfect legal title to the whole of it, or of selling or conveying such title to another. The Chief Justice was not discussing, most probably did not have in mind at all, the question of an equitable administration of partnership realty by a sur

viving partner.   He was dealing with the rights of the latter relatively to the legal title only, and all we have said in this opinion on that subject is in substantial harmony with the views expressed by him in the case cited. Properly understood and construed, there is nothing, we think, in that case which is necessarily in conflict with the doctrine announced in the case at bar, that a surviving partner may, in settlement and satisfaction of a partnership debt, convey to the creditor holding the debt an equitable title to the interest of a deceased copartner in land held and used by the firm in its business; and that such conveyance may be made the basis of compelling the heirs of the deceased partner to convey the legal title.

In the present case, there was no dissolution of the firm before the death of J. M. W. Cody, and moreover, the land in dispute was actually used by the partnership in the prosecution of its business.   There seems to be no doubt that the interest of the deceased Cody in this land would be subject to the payment of the partnership debts.   This view is certainly consistent with all that was said in *Baker's* case.   We are satisfied, after a careful examination of that case and the authorities therein cited, that none of them constrain a holding differing from that now made, and we think the conclusion we have reached is consistent with the true law of the question, so far as we have been able to ascertain from an examination of many authorities, and after giving the subject much thought and consideration.

It was urged, however, that Palmour's conveyance to the bank was void, because the claim held by the bank was affected with usury.   Even if it was, this would make no difference, the payment in land being applied only to the principal and lawful interest, and it appearing that the usurious contract was made prior to the time of such payment.   In this connection see *McCaskill*

*et al.* v. *Lathrop & Co.,* 63 *Ga.* 96; *DeLaigle* v. *Denham,* 65 *Ga.* 492.

9. In dealing with the numerous questions presented in this case, we have not discussed, or stated literally, the assignments of error as they are set forth in the motion for a new trial; nor have we expressly covered all the grounds of the motion. We have, however, endeavored to formulate the principles of law applicable to this case, as we understand it, and to give our reasons, supported by authority, for the conclusions we have reached. The charge of the court, in some vitally important particulars, being at variance with the true law applicable, we deem it proper to order a new trial. Let the same be had in conformity to the views herein expressed.        *Judgment reversed.*