J. S. WILCOX ET AL. v. FIRST NATIONAL BANK OF AUSTIN.

No. 858.    Decided February 12, 1900.

1. **Vendor's Lien—Implied—Waiver—Other Security.**

An implied lien is created when land is conveyed by deed, and, no independent security being taken, neither the deed nor obligation for the purchase money either reserves or waives a lien for its payment; in such case, the taking of a promissory note for the purchase money, with third parties as sureties, or the renewal of the purchase money note with such additional security, raises a presumption that the lien is waived. (P. 330.)

**2. Vendor's Lien—Express—Waiver—Renewal—Other Security.**

Where a vendor's lien is expressly reserved, the taking of a new note with sureties, in renewal of the original note for the purchase money, of itself neither releases the lien nor creates a presumption that it was intended to be discharged. (P. 330.)

**3. Same.**

It is misleading to speak of waiver as applicable to an express lien. When a lien is once created by express agreement the land is not to be disincumbered save by a payment of the debt or a contract for the release or discharge of the incumbrance. (P. 331.)

**4. Same.**

A deed retained an express lien for purchase money, which was made a part of the consideration of a larger note including other debts, and that note was taken up, after maturity, by a new note with personal security, covering the amount of that as well as of another note also due. Nothing was said, in this renewal, about either waiving or retaining the lien. Held, that the vendor's lien was not waived. (Pp. 326-331.)

**5. Lien—Limitation.**

An action to enforce a lien upon land, there being no adverse possession, is not barred until the debt is barred. (P. 332.)

**6. Same—Judgment—Execution.**

A judgment on which execution issued within one year from its rendition does not become dormant until ten years after the last issuance of execution thereon. (Pp. 331-333.)

**7. Same—Dormancy—Diligence.**

Though the Act of 1866 (Paschal's Digest, articles 7005-7007) providing that "no judgment * * * shall become dormant unless ten years shall have elapsed between the issuance of executions thereon" was not incorporated in the Revised Statutes of 1879, article 3160, as well as the report of the revisers, shows that it was not intended to change the rule there laid down, but that they proceeded on the theory that the common law rule as to dormancy of judgments (similar to that of the Act of 1866) and not the rule once announced in DeWitt v. Jones, 17 Texas, 620, was in force. (Pp. 331-333.)

Error to the Court of Civil Appeals for the Second District, in an appeal from Archer County.

Suit was brought by the bank, which had judgment for the foreclosure of its lien, and upon its affirmance on defendants' appeal they obtained writ of error.

*Bomar & Bomar,* for plaintiffs in error.—When J. W. Wilson discounted to plaintiff the two notes executed by the Stone Cattle and Pasture Company to him, one for $6000 and the other for $5617.50, and took up the two notes executed by the Stone Cattle and Pasture Company to A. L. Rhomberg, one for $6200 and one for $3100, and which were sold by Rhomberg to plaintiff, the lien that secured the first two notes was thereby released. Jackson v. Hill, 39 Texas, 496.

The court was in error in holding that the question of whether or not the lien was waived was submitted properly to the jury, and therefore there was no need in submitting defendant's special instructions.

If when land is sold and no lien is retained in the deed the law implies a lien, but when land is sold and security other than the land is taken the law does not imply a lien, and if there was an understand-

ing that the taking of other security should not be a waiver of lien, the burden of proof is clearly on plaintiff to show on appeal that there is no waiver. This is clearly a case where the law can not trace the old lien to new notes unless there was an agreement to that effect, but it may be that a verbal agreement could have been made continuing the lien of the old notes to secure new notes; this we doubt, but certainly at least the burden would be on plaintiff to show that such an agreement was made.

When a note secured by a lien is renewed and additional security taken the presumption is that the lien is released. The law implies, when a note is renewed, that the lien of the old note secures the new, but this is merely an assumption that can be maintained in equity, but this is no reason to imply a continuation of the lien where the party takes additional security.

A cause of action on a judgment where an execution has issued within one year from its date is barred by limitation in four years. Sayles' Civ. Stats., arts. 3358, 3361.

Article 3358, Sayles' Statutes, provides that all causes of action not enumerated in the statute shall be barred in four years from the date of accrual. Article 3361 of the same statute provides that a judgment on which there has been no execution within a year can be revived or suit brought thereon within ten years from its date. But we have no statute providing for limitation on a judgment where execution was issued within a year.

Now then it is clear that all causes of action are covered by the four years statute unless they are otherwise specifically provided for, and it is also clear that the court can not engraft anything upon a statute, or change it in any way, or make a statute of limitation, or do what the Legislature would reasonably have done had their attention been called to the condition of the law. The court must construe the law as it finds it, and not make statutes. Therefore the four years statute of limitation will cover the case.

Article 2326a, Revised Statutes of Texas, 1895, was passed in 1895, and provides that when an execution has issued within twelve months that the judgment should thereby be kept alive for ten years and that an execution could be issued thereon at any time within ten years from the issuance of the preceding execution, but no such statute existed prior to 1895, and there was no statute law whatever regulating issuance of executions after the first one prior to 1895. But at any rate this last mentioned statute is not a statute of limitation, but a statute regulating the issuance of executions, and is not even to be found in the chapter on limitations. Hence nothing can be construed as affecting limitation unless it is in the chapter on limitations.

Plaintiff's cause of action was at least barred by the ten years statute of limitation.

Plaintiff's judgment was dormant when this suit was instituted, both by reason of the fact that execution was not issued on same between 1885

and 1889 and the fact that more than ten years had elapsed between its date and the institution of this suit.

Limitation on a cause of action on a judgment runs from its date, and the issuance of executions on same each year, while it keeps it alive for successive excutions as provided by statute, does not stop the statute of limitation from running, for the reason that the statute on issuance of execution is not a statute on the subject of limitation.

In De Witt v. Jones, 17 Texas, 623, the court held that a judgment becomes dormant if execution is not issued every year. See also to same effect Sydnor v. Roberts, 13 Texas, 617; Hancock v. Metz, 15 Texas, 210; Hawley v. Bullock, 29 Texas, 218; Broughton v. Dawson, 1 Nott & McCord (S. C.), 404.

Between 1879 and 1895 there was no statute providing how long a judgment should be kept alive by reason of issuance of execution, and this was the cause of the statute of 1895 being enacted. When De Witt v. Jones, 17 Texas, 623, was decided, the statute that decision construed was like the one that existed from 1879 to 1895. From some time in the 60's down to 1879 the statutes were like they are made by the statutes of 1895. Hence the common law was in force when De Witt v. Jones was decided, and also from 1879 to 1895.

We therefore contend that plaintiff's judgment became dormant in 1886, and we further contend that if it did not become dormant in 1886 that it became dormant after the lapse of ten years from date, notwithstanding the issuance of execution, and was dormant at date of filing this suit, to wit, May 3, 1897. If execution could issue on a judgment between 1879 and 1895 after the lapse of ten years, then there was no necessity for the statute of 1895.

If execution could not be issued on said judgment at the time this suit was instituted, then it was dormant and had to be revived against the defendants in said judgment before suit could be filed to foreclose the lien sued on. Slaughter v. Owens, 60 Texas, 668, so holds.

*T. H. Marburg* and *F. E. Dycus,* for defendant in error.—The question as to whether the taking of the new notes with additional security constitutes a waiver of a vendor's lien already in existence is one of fact, and is purely one for the jury.

Where the holder of a vendor's lien note surrenders the note and takes a new one in lieu of it with additional security on such new note, then the intention of the parties in such transaction is to be looked to in determining its effect, and if any presumption whatever arises it is one of fact, and the finding of the jury that it was not the intention to waive the lien is conclusive on that question. Cordova v. Hood, 17 Wall., 1; Marshall v. Marshall, 42 S. W. Rep., 353; Williams v. Murphy, 36 Texas, 175.

The vendor's lien is not a creature of contract, but one of equity, and the question as to whether the directors of the cattle company authorized J. W. Wilson, its president, to make a contract agreeing that such

lien should continue in force to secure the new notes was immaterial, inasmuch as said lien continued without such contract. Brown v. Christie, 35 Texas, 690; Slaughter v. Owens, 60 Texas, 668; Beck v. Tarrant, 61 Texas, 403; Ellis v. Singletary, 45 Texas, 27; Price v. Lauve, 49 Texas, 74; Howard v. Herman, 29 S. W. Rep., 542.

Appellee objects to a consideration of this assignment because the special charge number 4 requested by defendants was on the weight of the evidence and was an incorrect proposition of the law.

The law forbids the court from commenting on the evidence, and the court could not instruct the jury that the transaction in question would amount in law to a waiver of the lien, inasmuch as it related to a question of fact which the jury alone were to consider. Irvin v. Garner, 50 Texas, 48; Flanagan v. Cushman, 48 Texas, 241; Houston v. Dickson, 66 Texas, 79.

Plaintiff claims the action was not barred either by the four or ten years statute of limitation, for the reason that the debt which said vendor's lien was retained to secure had been kept alive by the judgment against the Stone Cattle and Pasture Company, the original makers of the notes, and by the issuance of executions on said judgment. Beck v. Tarrant, 61 Texas, 403; King v. Brown, 80 Texas, 278; Ewell v. Daggs, 108 U. S., 143; Slaughter v. Owens, 60 Texas, 668.

GAINES, CHIEF JUSTICE.—This suit was brought by the defendant in error, the First National Bank of Austin, against the plaintiff in error to enforce an alleged vendor's lien, for $496 and interest, upon a section of land, known as section 2 of lands surveyed for the Southern Pacific Railroad Company, lying in Archer County. The plaintiff obtained a decree in its favor for the foreclosure of a lien as prayed for, which, upon appeal, was affirmed by the Court of Civil Appeals.

On the 29th day of May, 1883, one A. L. Rhomberg conveyed to the Stone Cattle and Pasture Company, a corporation, the tract of land upon which the lien is claimed. The consideration recited in the deed was $992, and a lien for $496 of the purchase money, due in twelve months, was expressly reserved in the face of the deed. Whether the deferred payment was a part of the $992 does not clearly appear from the terms of the conveyance, nor is it a matter material to a determination of this suit. It does not appear that any separate note was given for the $496; but, on the 4th day of June, 1883, the cattle company executed to Rhomberg its promissory note for the sum of $6200, due twelve months after date and bearing interest at the rate of 10 per cent per annum from date. On the 16th day of July, 1883, the company also executed its note to the same payee for the sum of $3100 for the purchase money also of certain other sections of land. There was testimony tending to show that a separate deed was made for each section of land, but that only the two notes mentioned above were given for the unpaid purchase money; and it seems clear that the purchase money of the section in controversy was embraced in the note for $6200. It is

probable that although the deed is dated May 29th, it was not delivered until June 4th, the day on which the note was executed. The two notes just described were transferred by Rhomberg to the First National Bank of Austin, the plaintiff in the trial court and the defendant in error here. They were not paid at maturity, but on the 4th day of December, 1884, the Stone Cattle and Pasture Company executed and delivered to the bank two notes, one for $6000 and the other for $5617.50, and each due on the 1st day of August, 1885, and bearing interest after maturity at 12 per cent per annum. These notes were made payable to one J. W. Wilson, the president of the cattle company, and were indorsed by him and seven others, each of whom was a director or stockholder in the corporation. When they were delivered to the bank, the two original notes—one for $6200 and the other for $3100—were marked paid and delivered up to the agent of the cattle company. The new securities were given for the two original notes; and the cashier of the bank and its president, at the time the transaction took place, seemed to think that a third note for a small amount, about which they testified vaguely, was also included. But if the interest on each of the two old notes be calculated to the day it fell due and be added to the principal, and interest on that sum be calculated at 12 per cent per annum to the date of the maturity of the two new notes, allowing the days of grace, and be again added, it will be seen that the amount of the two notes, with the interest so added, make very nearly $11,617.50, the sum of the indebtedness evidenced by the new obligations. This leaves no room to doubt the old notes constituted the sole consideration for the new.

When the notes fell due they were not paid. Thereupon the bank brought suit against the parties liable thereon and obtained judgment. Executions were issued, but the maker and the indorsers (who were probably sureties) having become insolvent, but little was collected. One of the defendants paid $2250 and obtained a release, it being agreed that his codefendants should not be discharged. The defendants in the present suit were subsequent purchasers of the section of land upon which a lien was sought to be foreclosed, claiming title through the Stone Cattle and Pasture Company. Among other defenses, they claimed that if any lien had ever existed upon the land it had been waived by the taking of the new notes of the corporation with its directors and stockholders as indorsers or sureties.

In reference to the waiver of the lien, the cashier of the bank testified: "I never agreed to make release and discharge vendor's lien as security, as I did not take the two renewal notes. The question was not submitted to me, but having one of the notes held for a lien, I suppose the idea was to retain the lien. The custom was, when a note was renewed by new note, the old one was stamped 'paid.' I did not agree to release the lien on land. I do not remember any particulars of conversation with signers. The president of the bank transacted the business. I judge from the entries in the books that it was intended for part renewals of past due indebtedness. If the president of the bank in-

tended to retain lien, I do not know why note was marked paid. I do not know that it was ever marked paid. * * * I do not think I had any conversation with J. W. Wilson on the subject of the renewal of the notes in December, 1884, that was covered by the two notes for $6000 and $5617.50. I think this conversation must have been with J. T. Brackenridge, president of the bank at that time. Yes, I remember that I did not release the lien. I do not know personally of any distinct understanding about any release." The former president of the bank testified as follows in regard to the same matter: "The vendor's lien was never released to my knowledge. I can not say what the bank's books show. They are not in my possession and I do not have access to them. * * * At the time of the renewal notes, I did not agree to release the vendor's lien. I never had any such idea. I had no authority as president of the bank to release any security held by it, but only to take additional security. No, I never did release liens securing indebtedness to the bank, except upon payment of all notes when the bank would release it. Of course I relied upon the lien as the last hope, the last prospect. Yes, it is customary for banks generally in renewing notes to mark paper paid when renewal is granted, and it is a fact that the bank does not carry past due paper as a rule. No, I did not agree on the execution of the two notes for something over $11,000 in December, 1884, to release the lien. I can not recollect the conversation, but they never asked or hinted at such a thing as getting a release of the lien that I recollect of. No, sir, the new notes were taken as an extension or renewal, extending the time of payment. * * * I can not recollect what I stated, but I certainly relied upon it and they so understood it. * * * If the note was stamped 'paid' it was extended by renewal, and if it was intended to release the lien, I would have executed a document to that effect. My intention was to collect the money from the parties first, and, if I failed, to get the lands afterwards, and this note being lost, it was not included. I can not recollect what Wilson said to me, or what he wanted when we readjusted the matter in December, 1884. All he wanted was more time. I do not recollect anything that was said, if anything, about releasing the lien."

For the defendants, Wilson, the president of the cattle company at the time the transaction took place, testified as follows: "I went to Austin to see the First National Bank for the purpose of getting them to take the new notes in settlement of the old ones, and that I did induce the First National Bank to take the said new notes with the additional indorsements of the directors and stockholders aforesaid in payment of the old notes. Yes, the original notes above described were taken up by me at the time of their payment, and were stamped 'paid' by the stamp of the First National Bank of Austin, and were delivered to me as president of the Stone Cattle and Pasture Company, and as before stated, I delivered said original notes to D. T. Bomar at his request at my house in July, 1897, and he informs me that they were burned in his office some time ago. They were in my possession from the time they

were paid until I delivered them to Mr. Bomar.   I had no understanding one way or the other with the First National Bank, that I can remember of, with reference to said notes, except that they discounted the new notes offered by me and applied the proceeds to the payment of the old notes, and marked them paid and delivered them to me.   I have no recollection about anything having been said about the discharge of the lien securing same, or it not being discharged.   I suppose that the payment of the notes necessarily discharged the lien, and particularly so when the bank, in discounting the other notes, obtained additional security.   My recollection is that I conducted the transaction with Mr. Brackenridge, the president of the bank.   I have no recollection as to whether or not I obtained a release of the lien securing said notes from said bank or not.   *   *   *   The whole history of this transaction is that the Stone Cattle and Pasture Company authorized me to execute new notes to be used in obtaining money to pay off the two notes for $6200 and $3100 and secured it by the indorsement to its stockholders and directors, and I took it and went to the First National Bank of Austin, who held our notes, and asked it to take the new notes and apply the proceeds to the payment of the old ones. which it consented to do, and furthermore, I paid all interest in cash and took up all old notes. It was not my idea that I was obtaining an extension of time to meet the old notes; if I had I presume the bank would have kept the old notes, but as it was, they gave their consent and stamped them paid, by taking the new notes and additional security.   I do not remember whether A. L. Rhomberg and anybody else were indorsers on the first notes when they were transferred to the bank or not; I presume they were, but can not state about this.   I do not have any recollection that the Rhombergs were troubling us about these notes at all, but my best recollection is that the First National Bank was demanding payment of us, and that for the purpose of making this payment the notes that we afterwards got the bank to take in settlement of these were made as aforesaid.   We expected at the time to pay the new notes given."   F. J. Hall, one of the indorsers of the new notes, also testified in reference to the lien, but his testimony showed that he was not present when the new notes were delivered and the old ones were taken up.   He did, however, testify that the new notes were signed and delivered to Wilson to be by him discounted for the purpose of raising money to pay off the old notes.

The court charged the jury in effect that if they found that the $496 unpaid purchase money of the land in controversy was embraced in the $6200 note given by the cattle company to Rhomberg, and that that note was embraced in the two notes subsequently given to the bank by that company, and that in that transaction the vendor's lien was not waived, they should find for the plaintiff.   The defendants thereupon requested the following special instruction:   "If you believe that $496, the purchase money of the land described in plaintiff's petition, was not evidenced by a note for that amount, but the amount of same was included

in the note for $6200, offered in evidence, which was given by the Stone Cattle and Pasture Company to A. L. Rhomberg, and that said $6200 note was taken up out of the proceeds of two notes executed by the Stone Cattle and Pasture Company to J. W. Wilson, indorsed by him and F. J. Hall et al., at the time same was so taken up, that no mutual agreement was made between said bank and the Stone Cattle and Pasture Company or some one for it, that the vendor's lien should be continued in effect and continue as surety for the new note, then you will find for the defendants." The charge was refused, and its refusal is assigned as error both in the Court of Civil Appeals and in this court.

We are of opinion that the charge should not have been given. With reference to the waiver or discharge of a lien for the purchase money of land sold upon a credit, there is a well marked distinction between an express lien and one that is merely implied. The implied lien is created when the land is conveyed by deed, and when, no independent security being taken, neither the deed nor obligation for the purchase money either reserves or waives a lien for its payment. But it was settled at an early day in this State that when a deed is made and no lien is expressly retained, the taking of a promissory note for the purchase money with third parties as sureties raises a presumption that the lien is waived. Parker County v. Sewell, 24 Texas, 238. This rule may also apply not only as to the original transaction, but also as to a renewal of the promise to pay the purchase money. That is to say, if a note for the purchase money of land, which is secured by an implied lien upon the land itself, be renewed or substituted by a new note or obligation which is secured by an independent security, the lien, in the absence of an agreement to the contrary, may be discharged. Such, however, is not the case before us and we are not called upon to decide the point. Here the lien was expressly reserved in the conveyance, and in such a case we understand the authorities to hold that the taking of a new note, with sureties, in renewal of the original note for the purchase money, of itself neither releases the lien nor creates a presumption that it was intended to be discharged. The point seems to have been decided by this court both in the case of Wright v. Wooters, 46 Texas, 380, and in that of Price v. Lauve, 49 Texas, 74. In the latter case, Mr. Justice Moore says: "The lien upon the property sold by appellee, although so called in the deed and note, is not in fact a vendor's lien, properly speaking, but an express contract lien, stipulated for and reserved in the deed conveying the land for which the note sued on was given. And the doctrine of waiver of the vendor's lien which equity implies in the absence of security for the payment of the purchase money, is wholly inapplicable." It is true that in that case the trust deed upon other land, which was claimed to show a discharge of the lien, was stipulated for in the original contract; but the court rests its decision distinctly upon the proposition just quoted. In the former case, Mr. Justice Gould uses this language: "We will add, that the taking of a new note with different sureties did not of itself, unless so intended, operate

as a release or waiver of the mortgage. The general rule is that a mortgage to secure a promissory note 'will remain security for any new note given in payment of the former one, unless there is an intention to the contrary.' There is a wide distinction between a mortgage and a vendor's lien; and facts would amount to a waiver of the latter which would be wholly insufficient in case of an express lien reserved by mortgage." We think the learned jurist would have been equally accurate had he omitted the words "reserved by mortgage," for the authorities hold that a lien expressly reserved in a deed is equivalent to a mortgage. Carpenter v. Mitchell, 54 Ill., 126; Conner v. Banks, 18 Ala., 42; Hines v. Perkins, 2 Heisk., 395; Magruder v. Peter, 11 Gill & J., 217; Adams v. Cowherd, 30 Mo., 458. The cases just cited also recognize the doctrine that when an express lien has been reserved, the taking of a new note with additional security in place of the original note does not release the lien. A lien created by mortgage or by an express reservation exists as long as the debt exists which it secures, unless it be discharged by some valid agreement between the parties. A debt for which a new promise or obligation with a new security is given is not of necessity and by that fact alone extinguished; and hence a mortgage by which it is secured is not extinguished, unless the parties agree that the new promise is to be taken as a payment of the debt or that the new security is given in lieu of the old and in discharge of it. To our minds, it is misleading to speak of a waiver of a lien as applicable to such a case. It is not inaccurate to say that a grantor who has made a deed without reserving a lien, and has taken an independent security for the purchase money, has waived his lien, because in such a connection it is merely meant to say that he has waived his right to claim a lien. But when a lien is once created by an express agreement, the land is not to be disincumbered save by a payment of the debt or a contract for the release or discharge of the incumbrance.

It is evident from the testimony adduced upon the trial of the case that when the new notes were taken there was no agreement as to a release or a retention of the lien. The officers of the bank depose that they did not intend to release it, while the president of the cattle company testified, in effect, that he did not intend that it should be reserved. Neither recollected that the subject was mentioned when the notes were renewed. The requested charge directed the jury to find for the defendants unless they believed that when the notes were renewed there was an agreement that the lien should be retained. Such is not the law, and therefore the charge was properly refused.

But it is insisted that the trial court and the Court of Civil Appeals erred in not holding this action barred by limitation. The facts in relation to that matter are, that the debt fell due August 1, 1885; that judgment was obtained on the note, which included the purchase money of the land in controversy, October 9th of the same year; and that executions issued thereon within twelve months from the rendition of the judgment and were followed by an alias and a pluries, issued respect-

ively on the 31st day of October, 1889, and on the 8th of March, 1890.
This suit was brought in May, 1897. Under the rule in this State, an
action to enforce a lien upon land, there being no adverse possession,
is not barred until the debt is barred. Slaughter v. Owens, 60 Texas,
668; Beck v. Tarrant, 61 Texas, 403. Adverse possession for the stat-
utory period would probably preclude a claim for a lien. Rev. Stats.,
art. 3347; Towns v. Harris, 13 Texas, 507. The provision in our Re-
vised Statutes in reference to limitation upon judgments is as follows:
"A judgment in any court of record within this State, where execution
has not issued within twelve months after the rendition of the judg-
ment, may be revived by scire facias or an action of debt brought thereon
within ten years after the date of such judgment, and not after." Rev.
Stats., art. 3361. The limitation is express where execution has not
issued within twelve months; but where execution has so issued, no
period of limitation is expressly prescribed. But no reason is seen why
the Legislature should prescribe a limitation in the one case and not
in the other; and therefore it has been repeatedly held that where ex-
ecution has been sued out within twelve months from the date of a
judgment, an action upon it will not be barred until the lapse of ten
years from the date of the last execution or the last act of diligence.
Fessenden v. Barrett, 9 Texas, 475; Willis v. Stroud, 67 Texas, 516;
Low v. Felton, 84 Texas, 378. But when we come to apply the rule
to the facts of this case, we encounter a more difficult question. Can
the issue and levy of the execution in 1889 be deemed an act of dil-
igence? This depends, as we think, upon the further question, whether,
at the time that writ was sued out, the judgment was dormant. Ar-
ticle 3361 of the Revised Statutes was contained in the second section
of the Act of March 17, 1841, "concerning limitations." In De Witt
v. Jones, 17 Texas, 620, the court, construing this statute in connec-
tion with the twelfth section of an act of the same date concerning ex-
ecutions, held that although execution should be issued within the twelve
months, yet the judgment would become dormant unless executions
were successively sued out from term to term, or, at least, within twelve
months of each other. The point is not discussed by the able jurist who
wrote the opinion. It is clear that the decision can not rest upon the
common law. In that system, the well established rule is that if a
fieri facias issue within a year and a day from the date of the judgment,
it was not necessary to issue writs either from year to year or term to
term in order to preserve the activity of the judgment. 2 Tidd's Pr.,
1104; Aires v. Hardress, 1 Strange, 100; Craig v. Johnson, Hardin
(Ky.), 520; Jackson v. Stiles, 9 Johns., 390; Johnson v. Glover, 2 Cranch
C. C., 678, and authorities there cited. The correctness of the rule an-
nounced in De Witt v. Jones was questioned in the case of Millican v.
Ware, 84 Texas, 308. But if that rule was the law when that case was
decided, in our opinion, it was not the law when the judgment under
consideration was rendered. In 1866 a statute was passed which
amended the law as to the lien of judgments and also provided that

"No judgment of a court of record shall become dormant unless ten years shall have elapsed between the issuance of executions thereon." Pasch. Dig., arts. 7005-7007. This act was not incorporated in the Revised Statutes of 1879 in so many words either under the title of "Liens" or of "Executions." In lieu thereof, provisions were inserted for acquiring a lien upon the lands of a defendant in a judgment for money by filing, recording, and properly indexing in the office of the clerk of the county court an abstract of the judgment. Among these provisions is found the following: "When a lien has been acquired as provided in this chapter, it shall continue for ten years from the date of such record and index, unless the plaintiff shall fail to have execution issued upon his judgment within twelve months after the rendition thereof, in which case said lien shall cease to exist." Rev. Stats. 1879, art. 3160. It is worthy of note that in their report the commissioners who compiled the revision of 1879 say, in effect, that they had made no material change in the law of executions. Therefore, it is not to be believed that it was the intention to repeal the existing law in regard to executions upon judgments and to require that executions should issue from term to term or from year to year in order to prevent a judgment becoming dormant. That such was not the intention is shown by the article last quoted. In effect, the declaration is positive that if the plaintiff shall have execution issued upon his judgment within twelve months from its rendition, the lien shall continue ten years from the date of the recording and indexing. But one execution being necessary to preserve the lien for the period of ten years, is it to be conceived that the Legislature intended that the judgment should become dormant unless executions should succeed each other from term to term or from year to year. We must give the Legislature credit for consistency of purpose and presume that while they intended the lien should continue for ten years by virtue of the issuance of one execution, they did not intend to take away the right to its enforcement unless the executions were continuous. We think, therefore, that in providing for the continuance of a lien acquired by recording and indexing an abstract of a judgment, the Legislature proceeded upon the theory that the common law rule as to the dormancy of the judgment would apply and that when an execution had issued within a year from its rendition, it would need to be revived neither by scire facias nor action of debt.

We therefore conclude that the judgment in question was not dormant when execution issued on it in 1889, and that therefore it was not barred by limitation when this suit was brought.

We are of opinion that we were in error in granting the writ, and therefore the judgment of the District Court and that of the Court of Civil Appeals are affirmed.

*Affirmed.*