MARTIN et al. v. DIAL et al.
No. 1381—5976.

Commission of Appeals of Texas, Section B.
Feb. 1, 1933.

Hamilton & Hamilton, of Dallas, G. R. Pate and Burney Braly, both of Fort Worth, Don Emery, Morgan, Morgan & Britain, and S. A. L. Morgan, all of Amarillo, Black & Graves, of Austin, John E. Green, Jr., and David Proctor, both of Houston, and J. T. Montgomery and R. C. Stanford, both of Wichita Falls, for plaintiffs in error.

Lloyd Fletcher, of Amarillo, H. D. Bishop, of Austin, and W. B. Harrell, of Dallas, for defendants in error.

LEDDY, Judge.

This case involves the title to a large tract of valuable oil land situated in Hutchison county, Tex. The record is very voluminous. Three opinions were written by the Court of Civil Appeals, covering more than 50 type-written pages. The application for writ of error contains over 200 pages.

We have given all of the questions present-ed by this record a most careful consideration. The conclusion we have reached on two of the principal legal questions raised disposes of this controversy. It will therefore only be necessary to quote such portions of the rec-ord as are pertinent to our decision of these particular questions. The two questions, the determination of which decides this con-troversy in favor of plaintiffs in error, are these:

First, the will of J. C. Dial constitutes Ger-trude A. Dial independent executrix of his estate.

Second, the oil and gas lease and deed exe-cuted by C. L. Dial, surviving partner of the firm of Dial Brothers, and Gertrude A. Dial, individually and as the executrix of the es-tate of J. C. Dial, conveyed a good title to the grantees therein.

The will of J. C. Dial, omitting portions immaterial to this controversy, is as follows:

"Second: I desire and direct that all of my just debts be paid upon proof of the exist-ence of same without delay, and that such proof shall be made of the existence and just-ness of said debts by the sworn statements of all holding the same, and that they be paid by my executrix hereinafter mentioned."

"Third: It is my will and desire, and I so direct, that all the property of which I may die seized and possessed of, both real and personal, pass to my beloved wife, Gertrude A. Dial, after the payment of all just debts and the expenses incident to the probation of this will, subject, however, to the following conditions:

"(a) That the same shall be held by her for the support and maintenance of my children and the support and maintenance of my wife during widowhood.

"(b) That at the end of her widowhood that all of such property, both real and personal, pass to and be vested in fee simple, share and share alike to my children who may be living at such time, or their issues, if any there be.

"Fourth: I hereby appoint and constitute my beloved wife, Mrs. Gertrude A. Dial, the sole executrix of this my last will and testament during her widowhood and that during such widowhood no bond or other security be required of her as such executrix, but upon the termination of such widowhood I direct that my brother, C. L. Dial, be appointed executor of said estate, both real and personal, and that no bond be required of him as such; it being the intention of this will and of the testator herein that the wife of the testator have full control and management of all of the testator's estate, both real and personal, for the use and benefit of herself and the children of herself and the testator during her widowhood, but that at the end of said widowhood that all of said property, both real and personal, pass and be vested in the testator's children, and that the control and management of the same be divested from the said wife of the testator at the end of such widowhood and be placed beyond her control and management in the brother named herein of the testator if he be living, and if not living then in the nearest of male kin to said testator; that at the end of such widowhood the executrix herein be required to render an account stating the amount of property on hand at the time, both real and personal, and that the same be filed as a part of the record in the probation of this will, and that upon the devisees herein becoming of age that the executrix or executor, as the case may be, likewise file a statement showing the amount of property, both real and personal, on hand at such time, but that no bond be required of either party; the testator herein relying upon the honesty and integrity of the parties herein named.

"Fifth: It is my desire that no other action, and I so direct, shall be had in the county court in the administration of my estate than to approve and record this will and to return an inventory and appraisement of my estate and list of claims.

"Sixth: I also direct and desire that such insurance policies that are payable to my children be paid over by the insurance companies direct to the executrix herein named immediately upon proof of death and that such executrix hold the same for the use and benefit of the beneficiary or beneficiaries named in such policy, using the same for the support, maintenance and education, according to their station in life of such beneficiary or beneficiaries therein named; that the insurance company require no bond for the delivery of such money. Should, however, at the end of the executrix' widowhood she should elect to keep the children of the testator herein, then it is directed by this will and testament that she be required to support and maintain said children at her own proper expense, excepting that after said children have passed through the high school that the moneys herein devised shall be used for their education in some approved educational institution in the event she of her own means may not be able to do so.

"Seventh: In construing this will I direct that it be construed as rigidly as possible in favor of the executrix herein during widowhood, but after that time I direct that it be construed as nearly as can be so against such executrix and in favor of the devisees herein."

Plaintiffs in error contend that the provisions of testator's will conclusively evince an intention that Gertrude A. Dial, as executrix, should handle his estate free from any action of the probate court.

Defendants in error insist that the will properly construed does not authorize the estate to be administered free from the control of the probate court. This insistence is based, first, on the provisions of the will which require Gertrude A. Dial, as executrix, at the end of her widowhood to render an account stating the amount of property on hand at the time, both real and personal, and that the same be filed "as a part of the record in the probation of this will, and that upon the devisees herein becoming of age, that the executrix or executor, as the case may be, likewise file a statement showing the amount of property, both real and personal, on hand at said time"; and, secondly, upon that provision directing that the executrix should pay claims against the estate upon sworn proof of their existence and justness.

The testator provided in his will that no bond should be required of the executrix, and in language too clear and plain to be misunderstood directed that his estate should be administered free from any control of the probate court. In fact, the provision of the will of testator in this respect is in practically the identical verbiage of the statute in regard to the administration of estates independent of the probate court. Article 3436, R. S. 1925.

An inspection of the entire will does not disclose any language fairly susceptible of a

construction which would destroy this clear and distinct expression of the testator's desire upon this subject. The direction to the executrix to require sworn proof of claims before payment does not call for or require any action whatever upon the part of the probate court. The testator certainly had the right to direct the method and manner in which the independent executrix should handle claims against his estate without thereby subjecting the same to the control of the probate court. However much he may have limited and restricted the power of the independent executrix, so long as such limitations or restrictions do not require or invoke any action by the probate court, it would not operate to prevent the executrix' handling the estate free from the control of such court.

Nor do the provisions requiring the executrix, upon ceasing to act as such, to render an account and statement, stating the amount of property then on hand, require any action upon the part of such court.

Defendants in error contend that the testator in using the word "account" meant to require the executrix at the end of her widowhood to file an account of all her acts as such executrix. From this premise it is reasoned that if such an account was required, it was necessarily implied that the probate court should determine its correctness. We are unwilling to give the word "account" the meaning defendants in error would thus place upon it. We think the testator in clear and specific language has specified what the required account should contain. His direction is that she should render an account *"stating the amount of property on hand at the time, both real and personal,"* and that the same be filed as a part of the record in the probation of the will. It is thus seen that the testator has distinctly defined what this account should contain; that is, a mere statement of the amount of real and personal property on hand at the time the executrix ceased to be a widow. The correctness of this view is confirmed by a subsequent provision of the will. That the nature of the instrument directed to be filed at the end of the executrix' widowhood is intended to be similar to that required when the minor devisees should become of age is plainly shown in the language of the will which provides that the executrix at that time should "likewise" file a *statement showing the amount of property both real and personal on hand.*

We think the will plainly shows that the desire upon the part of the testator that these statements be filed by the executrix when her official connection with the estate should cease, was solely for record purposes. He plainly manifests such intention in the language that the required statements "be filed as a part of the record in the probation of the will." The testator, who was a lawyer, knew that his estate was heavily indebted.

He had directed in his will that such debts should be paid. He is bound to have known that the payment thereof would require the sale of a large portion of his estate and that the property in the hands of the executrix at the time of either of the events specified in the will would not be the same as that shown by the inventory and appraisement. It was his evident purpose to have the record correctly reveal the specific property which the devisees would come into possession of at the time of the happening of either of the specified contingencies. Neither of these provisions required any action on the part of the probate court. They were merely directions to the executrix which the testator clearly had the right to give.

The provisions of the will in this case are wholly unlike those in the cases of Bain v. Coats (Tex. Com. App.) 244 S. W. 130, 131, and Hughes v. Mulanax, 105 Tex. 576, 153 S. W. 299, 300, which are strongly relied upon by defendants in error. In the first case cited the testator provided as follows: "It is my will that no other action shall be had in the county court in the administration of my estate than to prove, and record this will, to return an inventory and appraisement of my estate, to file, approve and record the bond of my executors or executor, as the case may be, and to require a report of all the acts of my executors or executor, in the said administration of my estate." It will be noted that this provision expressly directs that the probate court require the executor to report all his acts in the administration of the estate. In fact, the opinion of the court in that case clearly points out the difference in the provision of the will before the court from a requirement which merely directs the filing of a statement by the executrix. It is there said: "It [the will] authorizes the court to 'require a report of all the acts of my executors, or executor.' This provision of the will is not tantamount to a direction by the testator to an independent executor to file a report of all his acts. In such a case, the probate court would have no power or duty to perform concerning the matter, except when specially invoked by the suit of an interested party. In the case at bar, it becomes the duty of the court, of its own motion, to have the provision carried out."

The second case above cited is easily distinguishable from the instant case. There the will provided that the executor should give bond and make an annual report to the probate court, which reports were required to be "acted on by said court in the same manner as the annual reports of other executors and administrators."

The case of Epperson v. Reeves, 35 Tex. Civ. App. 167, 79 S. W. 845, 847, in which a writ of error was refused by the Supreme Court, is directly in point to sustain the view that the provision of the will in question re-

quiring the filing of statements by the executrix is not sufficient to place the estate under the control of the probate court. In the above case the will required the executor from year to year to "file a report * * * showing the condition of the estate, which may be seen by creditors and heirs." In holding that this provision did not operate to prevent the executor's acting independent of the probate court, the court said: "This, in our opinion, was not intended as any restriction on the exercise of the powers granted to the executors, nor as intended to give the court supervision over the acts of the executors in the administration of the estate, and, this being so, the powers of the executors were as ample with this provision in the will as without it. Besides, the provision expressly states the purpose of its filing to be that it may be seen by creditors and heirs, and did not contemplate that it should be audited by the court, and the acts of the executors embodied in it approved or disapproved. If such a construction were given this provision, it would entirely defeat the discretion which the testator conferred on his executors in plain terms. It is evident that this was his idea in reference to keeping the heirs and creditors informed periodically of what had been done by his executors, and that he did not intend thereby that the court should act upon such report, and thereby supervise or revise their proceedings. We conclude that the will comes within the provision of article 1995, Sayles' Rev. Civ. St., and that this was what is commonly known as an independent administration."

█ If we should interpret these provisions in accordance with defendants in error's view, we would bring the provisions of this will into irreconcilable conflict. The construction we have given avoids any conflict and harmonizes the provisions of the entire instrument. It is a well-settled rule of construction that where it is possible a will should be so construed as to harmonize inconsistent and repugnant clauses or provisions so as to give effect to each. Dulin v. Moore, 96 Tex. 135, 70 S. W. 742; Faulk v. Dashiell, 62 Tex. 642, 50 Am. Rep. 542; 40 Cyc. p. 1416, and authorities there cited.

█ Further, if we should adopt defendants in error's construction that the provisions of the third and fourth clauses of the will were intended by the testator to have the effect of placing his estate under the control of the probate court, such provisions would be in irreconcilable conflict with the fifth clause, in which he specifically provides that no action be had in the probate court except to probate the will and file an inventory and appraisement. With this direct conflict we should be compelled to give effect to the provision of the fifth clause, as it appears later in the will. It is the general rule that where there is an irreconcilable conflict between two clauses of a will, the later clause will prevail as being the latest expression of the testator's intent. Thrasher v. Ingram, 32 Ala. 645; Rogers v. Highnote, 126 Ga. 740, 56 S. E. 93; Harris v. Ferguy, 207 Ill. 534, 69 N. E. 844; In re Freeman's Estate, 146 Iowa, 38, 124 N. W. 804; Butler v. Moore, 94 Ind. 359; Deppen's Trustee v. Deppen, 132 Ky. 755, 117 S. W. 352; In re Bates, 159 Mass. 252, 34 N. E. 266; Martley v. Martley, 77 Neb. 163, 108 N. W. 979; Sheafe v. Cushing, 17 N. H. 508; Hendershot v. Shields, 42 N. J. Eq. 317, 3 A. 355; Adams v. Massey, 184 N. Y. 62, 76 N. E. 916; Baird v. Baird, 42 N. C. 265; In re Phillips' Estate, 205 Pa. 504, 55 A. 210, 97 Am. St. Rep. 743; Waring v. Bosher's Adm'r, 91 Va. 286, 21 S. E. 464; 40 Cyc. p. 1417, and authorities cited in note 37.

The facts pertinent to the question as to whether the oil and gas lease and deed to the land in controversy executed by C. L. Dial as surviving partner of the firm of Dial Brothers, and Gertrude A. Dial, individually, and as executrix of the estate of J. C. Dial, conveyed a valid title to the grantees in said instruments, are substantially these:

In the year 1914, J. C. Dial, an attorney, and his brother, C. L. Dial, a ranchman, with the view of operating a cattle ranch, formed a partnership under the firm name of Dial Brothers. C. L. Dial was employed to manage the business at a salary of $75 a month. J. C. Dial contributed to the original capital of the partnership the sum of $600 in cash. C. L. Dial delivered to the partnership 300 head of cattle incumbered in the amount of $5,000. This incumbrance was to be paid by the partnership, and C. L. Dial was to be reimbursed out of the partnership assets in the sum of $10,000 for the value of his equity in the cattle furnished to the partnership. It was agreed that the partners were to share equally in the profits and losses of the partnership.

In the year 1916 the partnership purchased the land involved in this controversy to be used in grazing the cattle. The partnership continued until April 8, 1918, on which date J. C. Dial died. At the time of his death the partnership owned the lands in controversy, which were incumbered with liens to secure purchase-money obligations for the payment of which the partnership was bound, in the sum of approximately $50,000. There were also on hand about 2,250 head of cattle, which were being grazed on the land involved, together with certain other leased lands. It appears that at the time of the death of J. C. Dial the partnership owed, in addition to the purchase money for the land and the debt claimed by the surviving partner, approximately $100,000.

J. C. Dial left surviving his widow, Gertrude A. Dial, and two minor children, David and Elizabeth Dial. He left a will, the terms of which have been heretofore set forth, naming Gertrude A. Dial as sole executrix without bond, which was subsequently probated and

his widow duly qualified thereunder by taking the statutory oath and thereafter for a period of about four years attempted to act as executrix free from direction of the probate court.

After the death of J. C. Dial, C. L. Dial, the surviving partner, continued in possession and control of the property belonging to the partnership estate and continued to look after the cattle which were grazed on the partnership lands.. Some three months after the death of J. C. Dial, a large portion of the debts owed by the partnership to banks and cattle loan companies were renewed. These creditors accepted new notes for their debts signed by C. L. Dial, the surviving partner, and by Gertrude A. Dial as independent executrix of the estate of J. C. Dial. These notes were also indorsed by W. H. Dial, the father of J. C. and C. L. Dial. These renewal notes were secured by chattel mortgages on the partnership cattle, and new mortgages were executed from time to time by C. L. Dial, the surviving partner, joined by Gertrude A. Dial, the executrix. The original notes given as a part of the purchase money of the land in controversy were never renewed.

The surviving partner testified upon the trial that in the summer of 1918 the weather was unusually dry and the grazing on the land was such that the cattle were in extremely poor condition, and that during the fall of that year they became infected with a contagious disease known as "scab"; that because of these conditions he was unable to dispose of any part of the cattle; and that in carrying the cattle through the following winter it was necessary to provide feed for them and also to dip the cattle at considerable expense, in an attempt to free them from the disease with which they were infected. He further testified that there were no partnership funds on hand with which to pay for feed or treatment of the cattle or to pay interest accrued on the debts owing by the partnership. Some eight months after the death of J. C. Dial, C. L. Dial was still in possession of the partnership property. At this time no proceeding of any kind had been instituted by the executrix or the devisees of J. C. Dial to disturb the possession and control of the partnership assets by C. L. Dial.

In December, 1918, C. L. Dial, the surviving partner, joined by Gertrude A. Dial, as executrix of the estate of J. C. Dial, deceased, and W. H. Dial (who purported to act as executor, but who clearly had no authority to do so), executed and delivered to T. E. Durham an oil and gas lease covering the land in controversy. Durham paid the surviving partner $2,751 in cash as a consideration for the lease. The lease contained the provision that if a well was not commenced on said land, or on other lands leased in this prospective oil field, on or before November 1, 1920, the lease should terminate unless a rental of $2,751 should be paid each year for the privilege of deferring the commencement of drilling operations. Such operations might only be deferred for a period of five years. Two annual rentals were paid, but before the third rental became due a well was drilled, with the result that oil and gas were discovered in paying quantities. C. L. Dial testified, without contradiction, that he executed this lease for the purpose of obtaining money to buy cake to feed the partnership cattle through the winter of 1918.

Portions of the partnership cattle were sold from time to time. On March 11, 1922, there still remained unpaid indebtedness of the partnership aggregating more than $125,000. About $50,000 of these debts were obligations executed during the lifetime of J. C. Dial as part of the purchase money of the land in controversy. Other debts of the partnership had been renewed from time to time, but were still unpaid. Some of the creditors of the partnership were demanding immediate payment of their claims. In order to satisfy these creditors and others holding obligations against the partnership, the surviving partner sold the land in controversy to N. H. Martin and J. J. Perkins, for the purpose of obtaining funds with which to discharge the existing partnership debts. The deed was executed by C. L. Dial, the surviving partner, joined by his wife, and Gertrude A. Dial for herself individually and as independent executrix of the estate of J. C. Dial, deceased, and by W. H. Dial, also purporting to act as executor of said estate. The consideration recited in the deed was the assumption by the grantees of the purchase-money obligations made prior to the death of J. C. Dial of approximately $52,000, and about $44,000 of other debts, most of which were renewals of partnership debts incurred prior to the death of J. C. Dial. A small portion of the indebtedness represented borrowed money used for the purpose of feeding and caring for the partnership cattle. It was shown, without dispute, that the grantees in the above deed paid all of the indebtedness assumed by them in this transaction.

This suit was originally brought by Gertrude A. Dial, suing for herself individually and as next friends of the minors, Elizabeth and David Dial. Lloyd Fletcher was appointed guardian ad litem for the minors. He filed a third amended petition in which no recovery was sought by Gertrude Dial. The suit was confined to an effort in behalf of the minors, through their next friend, to set aside and annul the oil and gas lease and deed to the property in controversy and to recover the interest in the property devised to the minors under the will of their father, J. C. Dial.

At the conclusion of the evidence the trial court peremptorily instructed the jury to return a verdict for plaintiffs in error. Upon the verdict thus returned judgment was ren-

dered that defendants in error take nothing by reason of this suit. Upon appeal the Court of Civil Appeals reversed the judgment of the trial court and remanded the cause for another trial.

In the defendants in error's petition in the trial court there was no charge that the purchaser of the oil and gas lease, or either of the purchasers under the deed to the land in controversy, made any false or fraudulent representations to induce the execution of either of said instruments, nor was it charged that either of said purchasers acted collusively with the surviving partner for the purpose of defrauding the estate of the deceased partner. The oil and gas lease and deed were attacked as being void for a number of reasons, the most substantial of which may be thus summarized:

(a) That the surviving partner was wholly without authority to execute the oil and gas lease on the partnership land as he was empowered to sell the minerals in said land for cash only.

(b) That said lease conferred only an option to explore the land for oil and gas and was not such a sale of the minerals as the surviving partner was authorized to make in the liquidation of the partnership affairs.

(c) That both the oil and gas lease and the deed were void because they were executed by the surviving partner after a reasonable time had elapsed for the liquidation of the partnership affairs.

(d) That the deed by the surviving partner was void because it showed upon its face that a large portion of the consideration was the assumption and payment by the grantees of renewed partnership debts which the surviving partner was without authority to renew so as to bind the partnership assets.

■■ The rule is well established that the death of one partner dissolves the partnership. The law, however, places upon the surviving partner the duty to wind up the partnership affairs. After paying all outstanding indebtedness, he must account to the heirs and personal representatives of the deceased partner for their interest in what remains. In order to accomplish this purpose the surviving partner is entitled to the exclusive possession of the partnership assets. He is clothed with full power to sell all or any part of the partnership property for the purpose of paying such debts. His power in this respect is equal to that of a community survivor. Sanger v. Moody's Heirs, 60 Tex. 96, 101; Moore v. Steele, 67 Tex. 435, 3 S. W. 448; Sherk v. First National Bank of Hereford (Tex. Com. App.) 206 S. W. 507; Murrell v. Mandelbaum, 85 Tex. 22, 19 S. W. 880, 34 Am. St. Rep. 777; Amarillo National Bank v. Harrell (Tex. Civ. App.) 159 S. W. 858; Altgelt v. Alamo National Bank, 98 Tex. 252, 83 S. W. 6.

■ At the time of the execution of the oil and gas lease the partnership owed approximately $150,000. It was shown without dispute that the surviving partner had no funds on hand with which to pay these debts or to buy feed for the cattle. He had listed the land for sale with a number of brokers, but had been unable up to that time to effect a sale. There can be no question but that the surviving partner, under the circumstances, had the legal right to sell all of the land or any portion thereof in order to liquidate the outstanding indebtedness. It is equally clear that the sale of the oil and gas lease was a sale of an interest in the land. It is no longer an open question in this state that an oil and gas lease similar to the one under consideration conveys an interest in land. The purchaser of such lease takes a determinable fee to the minerals in place. Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S. W. 290, 29 A. L. R. 566; Corsicana Petroleum Co. v. Owens, 110 Tex. 568, 222 S. W. 154; Hager v. Stakes, 116 Tex. 453, 294 S. W. 835.

■■ But it is argued that the surviving partner could sell the minerals in the land only for cash. We are unwilling to assent to a proposition which would so restrict the power of a surviving partner in the liquidation of firm assets. The power of such partner to sell minerals in lands necessarily implies an authority to sell in the usual and customary way in which such minerals are ordinarily disposed of. Theisen v. Robison, 117 Tex. 489, 504, 8 S.W.(2d) 646; Sawyer v. Robison, 114 Tex. 437, 268 S. W. 151; Ehlinger v. Clark, 117 Tex. 547, 563, 8 S.W.(2d) 666. No sound reason has been advanced why a surviving partner should not be accorded the privilege of selling the minerals in a tract of land owned by the partnership in a way that is generally recognized as being the most advantageous. It is a matter of common knowledge that the average landowner almost universally disposes of the minerals in land situated in nonproductive territory through the execution of mineral leases retaining a specified royalty. The practical effect of the mineral lease executed by the surviving partner was to dispose of a portion of the minerals in place. We know of no rule of law that would operate to compel the surviving partner to dispose of all of the minerals by one transaction. The retained royalty, and even the interest in the lease with its stipulated rentals, was subject to immediate disposition by the surviving partner. It was no more necessary that he dispose of all of the mineral interest in the land by one conveyance than it was that he should sell the surface rights to all of the land at the same time.

Nor can we assent to the correctness of the holding of the Court of Civil Appeals that if the surviving partner delayed beyond a reasonable time in selling the partnership

realty to pay existing debts, his power to sell was thereby destroyed even though the debts remained unpaid, and that any conveyance made by him after the lapse of a reasonable time for the liquidation of the partnership affairs would be wholly void.

Undue delay on the part of a surviving partner in selling the partnership assets and liquidating existing debts does not operate to destroy, or in any way impair, the power of such survivor to sell the firm property. His duty to sell such property is a continuing one so long as there are unsatisfied debts existing against the partnership. As long as the duty continues, necessarily the power to sell must exist. Where a surviving partner negligently fails to proceed with reasonable diligence in disposing of partnership property for the purpose of discharging the outstanding indebtedness, the representative of the estate of the deceased partner or any creditor may invoke the aid of a court of equity to compel him to perform his duty in this regard, or in such proceeding may oust him and have the partnership affairs wound up through a receiver.

In the case of Clay v. Freeman, 118 U. S. 97, 6 S. Ct. 964, 968, 30 L. Ed. 104, the surviving partner had delayed selling the partnership property for a period of eighteen years after the death of his partner. The heirs of the deceased partner sued to recover an interest in the property. The court, in denying the right of the heirs to recover until there had been an accounting, said: "The same rule applies in the case of partnership property in the possession of the surviving partner. He has a right to hold it until the debts of the firm are paid, and if the firm is indebted to him, he has a right to hold it until he is paid. It is true, it is his duty to dispose of the partnership property, and settle the partnership debts. But that is a duty to which he may, at any time, be compelled by the representatives of the deceased partner; *and although his neglect or delay in winding up the concern may expose him to the animadversion of the court, and to the vigorous exercise of its power to compel him to do his duty, it will not relieve the partnership assets in his hands from the lien of the partnership debts.* [Italics ours.] Being in possession of those assets, he is not affected by the statute of limitations. If the statute runs against anybody, it runs against the representatives of the deceased partner in relation to their right to call him to account. The proposition that the partnership property can be taken out of the surviving partner's hands, and distributed among the several partners and their representatives without a settlement and payment of the partnership debts, including any balance due the surviving partner himself, is a proposition that equity will not for a moment entertain."

The testimony of the surviving partner shows that the delay in disposing of the partnership property was due to his desire to obtain a fair and reasonable price for the property. A surviving partner is vested with some discretion as to the manner of closing the business and the time to be taken for this purpose. He may hold the partnership property for a period sufficient to enable him to avoid a sacrifice of the assets and to make an advantageous disposition of the property. Big Four Implement Co. v. Keyser, 99 Kan. 8, 161 P. 592, L. R. A. 1917C, 166.

The representatives of the estate of the deceased partner and the creditors of the partnership are as much interested in the partnership property's being disposed of upon the most advantageous terms as is the surviving partner. If such partner abuses the discretion vested in him as to the time taken to dispose of the property, the legal representatives or creditors of the deceased partner are not without a remedy. They may upon proper showing, in a court of equity, compel a prompt disposition of the partnership property by the surviving partner. Gertrude A. Dial was the duly qualified and acting legal representative of the estate of the deceased partner. Being such representative, she was charged with the duty of taking such action as would protect the minors' interest in this property as well as her own. If the surviving partner was unduly or unreasonably delaying the sale of the partnership assets, she had the right to demand that he proceed with diligence to liquidate its affairs; and, if he failed to do so, she was entitled to invoke the aid of a court of equity to compel the performance of such duty. She took no steps whatever to compel the surviving partner to make an earlier disposition of the partnership assets; on the contrary, she consented and acquiesced in the delay. Acting in her official capacity as independent executrix of the estate of J. C. Dial, she joined the surviving partner in the execution of the renewal partnership notes, described in the deed to Perkins and Martin, and also joined in the execution of the oil and gas lease and deed to the land in controversy. Her action in this respect foreclosed the right of any of the devisees of the estate represented by her to complain of any undue delay in the sale of the partnership assets by the surviving partner.

If we were to hold that mere negligence of the surviving partner in not promptly disposing of the partnership real estate would operate to destroy his power to sell and render any deed made by him void, the title to property purchased from a surviving partner in the course of a firm's liquidation would rest upon a precarious basis indeed. In fact, it would be extremely difficult under such conditions for a surviving partner to sell partnership realty at anything like its fair val-

ue. The title to property purchased from such survivor would be subject to be defeated by the determination of an issue of fact as to whether the disposition of the property was made within a reasonable time after the death of a partner. It is altogether probable that there would be but few, if any, purchasers willing to take a title subject to such a risk. A number of tracts of land might be sold by a surviving partner on the same date, and yet in an attack upon such sales by heirs of the deceased partner some of the titles might be upheld while others might be defeated by the findings of different juries on the issue of fact as to whether the property was sold by the survivor within a reasonable time.

We conclude that the contention, that the deed of the surviving partner to the land in controversy is void because it appears that a part of the consideration was the assumption and payment of renewed notes for which the partnership was not liable, is equally without merit. It is true that the general rule is that the power of a partner to make a contract binding upon the firm ceases upon the dissolution of the firm by the death of a partner. The surviving partner can enter into no contract which will bind the estate of the deceased partnership except such as is reasonably appropriate and necessary in settling its affairs. First National Bank v. Payne & Co.'s Assignees, 85 Va. 890, 9 S. E. 153, 3 L. R. A. 284.

■ But where the partnership has no funds on hand with which to meet existing obligations and the same must either be renewed or the property of the partnership sacrificed through forced sale, the surviving partner, under his power to preserve the estate, is fully authorized to execute necessary renewals of existing indebtedness. While some of the texts announce the broad proposition that the surviving partner cannot execute a renewal of existing indebtedness which is binding upon the partnership assets, we think the better rule is that he may do so when in the exercise of a fair discretion he believes that such action is necessary to prevent the partnership property's being sacrificed.

■ It is a well-recognized principle of law that a surviving partner in performing his duty of liquidating the firm affairs may subject the assets of the partnership to a mortgage for money borrowed to discharge firm obligations. Ruling Case Law, vol. 20, p. 997, § 234, announces the rule in this regard as follows: "For the purpose of winding up partnership affairs a surviving partner has the power to borrow money and give a pledge or mortgage of the partnership assets. It seems that he may exercise this power even if the effect is to prefer one firm creditor over another. It has been pointed out that cases may arise in which the exercise of such au-

thority may be highly expedient if not necessary for the preservation of the rights of creditors and persons interested in the distribution of the assets of the firm."

In Rowley's Modern Law of Partnership, vol. 2, § 620, it is said: "The power of alienation, whether direct, by sale, or indirect, by incumbrance, of firm property by a surviving partner, when for proper purposes, is too well settled to raise serious question." The same author in the same section further says: "A surviving partner may likewise incumber by mortgage or pledge property of the firm, when it is necessary, and is done for the benefit of the firm, and when this is done in good faith, it has been held that the mortgage is effectual against the partnership creditors as well as against the representatives of the deceased partner * * *." The author further states: "And it has been held that if necessary to prevent sacrifice, he may give a trust deed upon partnership real estate to secure a firm debt."

There are many decisions of courts of the highest repute which sustain the rule as above declared. Durant v. Pierson, 124 N. Y. 444, 26 N. E. 1095, 12 L. R. A. 146, 121 Am. St. Rep. 686; Fitzpatrick v. Flannagan, 106 U. S. 648, 1 S. Ct. 369, 27 L. Ed. 211; Burchinell v. Koon, 8 Colo. App. 463, 46 P. 932; Id., 25 Colo. 59, 52 P. 1100; Knox v. Gye, L. R. 5; H. L. 656; Amunategui v. Spokane Cattle Loan Co., 36 Idaho, 688, 214 P. 211, 20 R. C. L. 997, § 234; Nat'l Exchange Bank of Lexington v. Wilgus' Ex'rs, 95 Ky. 309, 25 S. W. 2; First Nat'l Bank v. Cody, 93 Ga. 127, 19 S. E. 831; Fidelity Union Casualty Co. v. Hammock (Tex. Civ. App.) 5 S. W.(2d) 812.

If a surviving partner in liquidating the partnership affairs' has the power to borrow money for the purpose of paying existing indebtedness and pledge partership assets to secure its payment, there is no sound reason why he should be denied the right to renew existing indebtedness so as to bind such assets when he in good faith believes that a renewal is necessary to prevent a sacrifice of the partnership property. The power of the surviving partner to bind the partnership assets by his renewal of existing partnership indebtedness is affirmed by the Supreme Court of Georgia in the case of First National Bank v. Cody, 93 Ga. 127, 19 S. E. 831, 839. In holding that such power in the surviving partner exists the court observed: "It has been definitely decided by this court that where one holding a debt against a partnership accepts, after its dissolution, a renewal note or draft of one of the partners for the debt, and extends the time of payment, without the knowledge or consent of the other partners, they are absolutely discharged. * * * We cannot, however, assent to the proposition that where a firm is dissolved by death, and a note due by the firm is renewed

in the firm name by a surviving partner, the firm assets are not still bound for the debt."

A similar holding was made by the Supreme Court of Idaho in the case of Amunategui v. Spokane Cattle Loan Co., 36 Idaho, 688, 214 P. 211, 212, wherein it is said:

"The general rule would seem to be that surviving partners may transfer the personal property of the partnership by way of pledge or mortgage to secure the existing debts of the partnership, and when such transfer is made in good faith it is effectual against all other creditors as well as against the representative of the deceased partner. [Citing many cases.]

"A partnership being dissolved by the death of one of the partners, the survivor has the entire legal right to all of the assets of the firm for the purpose of winding up the affairs of the partnership. He has the right to dispose of them as he pleases, to settle all debts due to or from the concern, to make any compromises deemed necessary, and to turn the assets into an available and distributable form. [Citing case.]

"*He also has the right to secure extension of credits by renewals, or by pledge or mortgage of personal property to secure payment of partnership indebtedness,* and to transfer the indebtedness from one creditor to another for the benefit of the partnership."

In Espy v. Comer, 76 Ala. 501, the Supreme Court of Alabama held that although when a partnership is dissolved by the death of one of the members, the surviving partner cannot by any act or acknowledgment revive or continue in force a debt of the firm so as to bind the estate of the deceased partner, the discharge of his estate does not change the character of the debt as a partnership liability.

The Supreme Court of Iowa reached a like conclusion in the case of Van Staden v. Kline, 64 Iowa, 180, 20 N. W. 3. In that case it appeared that a firm had borrowed money securing it by mortgage on firm assets. After the dissolution of the firm by death, a surviving partner, in order to secure an extension of the lien, executed renewal notes and a mortgage to secure same. The court held that no new debt was created and that the partnership property continued liable for the original debt.

In any event, the right of those interested in the estate of the deceased partner to complain that these renewals by the surviving partner were not necessary for the proper preservation of the estate is foreclosed by the action of the independent executrix, who was charged with the duty of representing the estate of the deceased partner, in joining with the surviving partner in the execution of the renewed notes, the payment of which was assumed by the grantees in the deed to the land in controversy executed by the surviving partner. Where the duly accredited representative of the estate of a deceased partner, by a joinder in a conveyance, has led a purchaser of the property from the surviving partner to believe that the property is being conveyed upon a consideration satisfactory to the estate he represents, those for whom he thus acts should not be permitted, in the absence of fraud or collusion, to recover the property in a suit against such purchaser.

Aside from this there is no evidence showing that the parties intended to extinguish the original indebtedness by renewal of the notes existing at the time of the death of J. C. Dial. In the absence of such showing, the original indebtedness would remain in full force and effect. Since this is true, a sale by the surviving partner of the partnership property for the purpose of discharging such indebtedness would be authorized. Wilcox v. First National Bank, 93 Tex. 322, 333, 55 S. W. 317; Ellis v. Singletary, 45 Tex. 27; Wright v. Wooters, 46 Tex. 380; Dillon v. Kauffman & Runge, 58 Tex. 696; Hicks v. Morris, 57 Tex. 658; Daniel on Negotiable Instruments (5th Ed.) §§ 1266 and 1266L.

It is also asserted that a small portion of the indebtedness assumed in the deed and paid by the grantees represented money borrowed by the surviving partner to feed and care for the cattle and that such obligations were not a valid charge against the partnership assets, and therefore the deed to the land was void.

As we have heretofore shown, the independent executrix of the estate of the deceased partner consented and acquiesced in the action of the surviving partner in keeping the cattle for the length of time they were held by him. She knew, of course, that if the cattle were kept it would be necessary that they be cared for and fed. In her official capacity she joined the surviving partner in the execution of notes, the proceeds of which were used in caring for and feeding the cattle. Her action in this respect effectually prevents any one interested in the estate from claiming that the expense thus incurred in caring for the cattle should not be a charge against the partnership assets.

Even if it be assumed that the renewal notes executed by the surviving partner were effective to extinguish the original partnership indebtedness, the result would be that the surviving partner would have a valid claim for contribution against the partnership property on account of his having paid more than his pro rata share of the partnership debts. In other words, a surviving partner who individually pays the debts of the dissolved partnership is subrogated to the claims of creditors and he may satisfy his claim by the use of the same power of sale that he might have exercised to discharge

the claim if still held by the creditor. To deny a surviving partner the right of subrogation to creditors whose claims he has individually paid would be most inequitable and unjust. Indisputably the surviving partner had the power to sell the land in controversy in satisfaction of the original notes before they were renewed. If he could have legally sold it then for the payment of the debts instead of renewing them, surely he would be authorized to sell to reimburse himself for the amount of the debts he has individually discharged. The right of the surviving partner to contribution under such circumstances is clearly set forth in the following quotation from the case of Dyer v. Morse, 10 Wash. 492, 39 P. 138, 139, 28 L. R. A. 89, in which the court said: "It appears from the agreed statement of facts that the debts were all paid before the passage of the act of 1873, and that the surviving partner had taken possession of this property as his own, to reimburse himself for the moneys advanced by him in paying the debts of the firm, and that for that purpose he had paid out a sum in excess of the value of all its property. This being so, a court of equity will sustain his self-asserted title to the property, *if at that time it would have been in his power to have conveyed the property to another for the purpose of paying such debts.* This would not be the effect of such action, if all the property had not been required to pay the debts; but, in view of that fact, it would be inequitable to hold that the surviving partner did not obtain by the payment of the firm indebtedness the same right to the property which he could have conveyed to another."

There are numerous decisions to the same effect, among which we cite: Dillon v. Kauffman & Runge, 58 Tex. 696; Chalk v. Collier (Tex. Civ. App.) 208 S. W. 972; Hicks v. Morris, 57 Tex. 658; Durant v. Pierson, 124 N. Y. 444, 26 N. E. 1095, 12 L. R. A. 146, 21 Am. St. Rep. 686; Prudhomme v. Henry, 5 La. Ann. 700; Morris' Adm'r v. Morris' Adm'r, 4 Grat. (Va.) 293; Gee v. Humphries, 49 S. C. 253, 27 S. E. 101; Sells' Adm'rs v. Hubbell, 2 Johns. Ch. (N. Y.) 394.

■ At the time the deed to the land in question was executed, the partnership unquestionably owed a large part of the original purchase money which had never been renewed. The purchasers assumed and paid this indebtedness. It was thus established as a matter of law that the land was sold by the surviving partner for the purpose of paying existing partnership debts. Clemmons v. McDowell (Tex. Com. App.) 12 S.W.(2d) 955; Jones v. Harris (Tex. Civ. App.) 139 S. W. 69; Crawford v. Gibson (Tex. Civ. App.) 203 S. W. 375.

■ It was not necessary, in order to uphold the sale made by the surviving partner, that the exact amount of partnership debts be established or to trace the proceeds of the sale or to show that all of the proceeds were used in paying debts. Terrell v. McCown, 91 Tex. 231, 254, 43 S. W. 2; Clemmons v. McDowell (Tex. Com. App.) 12 S.W.(2d) 955; Norwood v. King (Tex. Civ. App.) 155 S. W. 366 (Writ Ref.); Stone v. Light (Tex. Civ. App.) 228 S. W. 1108.

■ ■ If the estate of J. C. Dial had been subject to the control of the probate court, that court would have possessed the power, upon proper showing by the executrix that a renewal of existing indebtedness was necessary to preserve the partnership's property in which the estate was interested, to have authorized her to join the surviving partner in the execution of such renewal. If she had done so under such authorization, there could be no doubt that the partnership assets would have been bound for the payment of such indebtedness. Since this is true, the joinder of Gertrude Dial as independent executrix in the renewal of such indebtedness would likewise bind the partnership assets, as she could do without order of the probate court any act which she could have done as an ordinary executrix under such an order. Dwyer v. Kalteyer, 68 Tex. 554, 5 S. W. 75; Carlton v. Goebler, 94 Tex. 93, 58 S. W. 829; McDonough v. Cross, 40 Tex. 251.

There are a number of other legal questions urged which it is unnecessary for us to consider, as a decision of them becomes immaterial because of the conclusions reached on the questions we have heretofore discussed.

The action of the trial court in peremptorily instructing the jury to return a verdict in favor of plaintiffs in error was proper. We therefore recommend that the judgment of the Court of Civil Appeals be reversed and the judgment of the trial court affirmed.

CURETON, Chief Justice.

The judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed.